[No. S000156. Mar. 17, 1988.]

RUSS BUILDING PARTNERSHIP, Plaintiff and Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

PACIFIC GATEWAY ASSOCIATES JOINT VENTURE, Plaintiff and Appellant, v. CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

CROCKER NATIONAL BANK et al., Plaintiffs and Appellants, v. CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

842

COUNSEL

Pillsbury, Madison & Sutro, Allan N. Littman, Robert M. Westberg, Kevin M. Fong, Debra B. Keil, Morrison & Foerster, James P. Bennett and Leigh R. Shields for Plaintiffs and Appellants.

Ronald Z. Zumbrun, Anthony T. Caso, Jonathan M. Coupal and Richard M. Stephens as Amici Curiae on behalf of Plaintiffs and Appellants.

Louise M. Renne, City Attorney, Burk E. Deleventhal, Deputy City Attorney, George E. Kruger, McMorris M. Dow, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., and Peter J. Busch for Defendant and Respondent.

OPINION

BROUSSARD, J.—In this case we are called upon to decide whether San Francisco's Transit Impact Development Fee (TIDF) ordinance may be applied to projects which, at the time of the enactment, were in the course of construction pursuant to building permits conditioned on the developers' participation "in a downtown assessment district, or similar fair and appropriate mechanism, to provide funds for maintaining and augmenting transportation service . . . ." We conclude that the condition encompasses the TIDF, and therefore hold that the TIDF may be imposed on the projects without impairing the developers' vested rights.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1979, plaintiffs Crocker National Bank and Crocker Properties, Inc. (Crocker) and Pacific Gateway Associates Joint Venture (Pacific) sought approval from defendant City and County of San Francisco (City) for the construction of two new office developments in the City's downtown area. As required under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), an environmental impact report (EIR) was prepared for each proposed project, detailing its probable impact on the downtown environment.

The draft EIR's revealed that the new office buildings would have an adverse impact on the San Francisco Municipal Railway system in the form of increased demand for public transportation downtown. That disclosure led to adverse public comment on the proposed projects, in response to which the developers proposed to mitigate the impact of their projects on the demand for transportation by participating in a transit funding mechanism if one were established by the City.[1]

The permit for Crocker's project was approved by the San Francisco Planning Commission's (Commission) Resolution No. 8332 on July 26, 1979; Pacific's permit was approved by Resolution No. 8378 on September 20, 1979. Each resolution contained the following language: "In recognition of the need for expanded transportation services to meet peak demand generated by cumulative office development in the downtown area, [the developer] shall participate in a downtown assessment district, or similar fair and appropriate mechanism, to provide funds for maintaining and augmenting transportation service, should such a mechanism be established by the City." The Commission imposed a similar "transit mitigation condition" on every other downtown office permit it approved in the latter half of 1979.[2]

On May 5, 1981, the San Francisco Board of Supervisors enacted the TIDF ordinance. (Ord. No. 224-81, codified at S.F. Admin. Code, § 38.1 et seq. [hereinafter ordinance].) The ordinance, which became effective the following month, requires developers of downtown buildings containing new office space to pay a TIDF as a condition of issuance of a certificate of completion and occupancy. (S.F. Admin. Code, § 38.4.) The TIDF, not to exceed $5 per square foot of new office space, provides revenue for the municipal railway to offset the anticipated costs of the increased

---

[1] Crocker responded to the public concern by adding the following to its draft EIR on May 18, 1979: "In recognition of the need for public transit services to meet peak demand generated by cumulative office development in the Downtown District, Crocker would consider shared participation in a downtown assessment district, or other such mechanism, to provide funds for mass transit, should such a mechanism be established."

Pacific responded by adding the following to its draft EIR on July 26, 1979: "The project sponsor recognizes the need for expanded transit services to meet the peak demand generated by cumulative office development in downtown San Francisco to which this project would add; therefore, the project sponsor will contribute to funds for maintaining and augmenting transit service, in an amount proportionate to the demand created by this project, through a funding mechanism, such as a special assessment district, if such a mechanism is developed by the City."

[2] It appears the Commission's practice of imposing transit mitigation conditions on downtown office developments began as early as January 4, 1979, when it approved an office project on the condition that "[t]he owner of the project shall make a good-faith effort to participate in future funding mechanisms to assure adequate transit service to the area of the [C]ity in which the project is located." (Com. Res. No. 8142.)

peak-period ridership generated by the new office space over the useful life of each office building. (S.F. Admin. Code, § 38.5.) The ordinance appears to be the first transit funding mechanism of its kind in California.[3]

Plaintiff Russ Building Partnership (Russ) filed a class action suit against the City to have the ordinance declared invalid on its face and as applied.[4] Crocker and Pacific filed a separate suit against the City challenging the "retroactive" application of the ordinance to buildings under construction before the ordinance was enacted.[5]

After separate trials on the validity of the fee and its "retroactive" application, the trial court entered judgments in favor of the City, finding that the TIDF is a valid development fee and that application of the ordinance to Crocker and Pacific did not impair their vested rights. All plaintiffs filed appeals, which were consolidated. The Court of Appeal upheld the validity of the TIDF, rejecting various constitutional and other attacks on the ordinance, but, by a divided vote, reversed the judgment as to Crocker and Pacific. Both Russ and the City petitioned for review. We granted the City's petition and denied Russ's, thus leaving intact the lower court ruling that the TIDF is a valid development fee. Pursuant to rule 29.2 of the California Rules of Court, we limited review to the interpretation of the resolutions authorizing Crocker's and Pacific's building permits and to whether the resolutions gave them adequate notice of the subsequently imposed TIDF.[6]

## II. DISCUSSION

■ "It has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substan-

---

[3] At the time Crocker's and Pacific's permits were issued, the notion that increasing costs of public transit service could be exclusively assigned to new development on a marginal cost basis had not been incorporated into a public financing mechanism.

[4] Russ represents approximately 6,000 similarly situated property owners in downtown San Francisco.

[5] Neither Crocker nor Pacific had received a certificate of final completion and occupancy as of the effective date of the ordinance, and it is undisputed that both projects meet the description of developments to which the TIDF applies in the ordinance as originally enacted and as amended in 1982. (See Ord. No. 275-82.) Instead of paying the TIDF in a lump sum, the developers have elected the statutory option of making installment payments over a 35-year period and, by agreement with the City, are depositing the fees under protest into an escrow fund. Crocker's fee is estimated to be $2,468,225; Pacific's is approximately $2,422,060.

[6] Plaintiffs subsequently requested that we expand the issues (see Cal. Rules of Court, rule 29.2(b)) to consider whether the TIDF violates the takings clause of the United States Constitution, as interpreted in the United States Supreme Court's recent decision in *Nollan* v. *California Coastal Commission* (1987) 483 U.S. __ [97 L.Ed.2d 677, 107 S.Ct. 3141]. (*Nollan* was decided after we granted review and before oral argument.) We denied the request.

tial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. [Citations.] Once a landowner has secured a vested right the government may not, by virtue of a change in the zoning laws, prohibit construction authorized by the permit upon which he relied." (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 [132 Cal.Rptr. 386, 553 P.2d 546], cert. den. and app. dism. (1977) 429 U.S. 1083 [51 L.Ed.2d 529, 97 S.Ct. 1089].) " 'The rule is grounded upon the constitutional principle that property may not be taken without due process of law.' " (*Urban Renewal Agency* v. *California Coastal Zone Conservation Com.* (1975) 15 Cal.3d 577, 583-584 [125 Cal.Rptr. 485, 542 P.2d 645], quoting *Aries Dev. Co.* v. *California Coastal Zone Conservation Com.* (1975) 48 Cal.App.3d 534, 543 [122 Cal.Rptr. 315]; see also *Highland Development Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 169, 186 [215 Cal.Rptr. 881].) The vested rights doctrine protects the developer's right not only to construct, but also to use the premises as authorized by the permit. (*County of San Diego* v. *McClurken* (1951) 37 Cal.2d 683, 691 [234 P.2d 972].)

Plaintiffs[7] had been issued building permits, had begun construction, and had made a substantial financial commitment to their projects almost two years before the City enacted the TIDF ordinance. Thus, they had a vested right to complete the buildings and occupy them under the conditions contained in the permits. It is clear that if the resolutions authorizing plaintiffs' building permits did not contain the transit mitigation condition, application of the later-enacted TIDF ordinance to plaintiffs would impair their vested rights and violate due process. (See *post,* pp. 853-854.) However, if the TIDF falls among the funding mechanisms contemplated by the resolutions, then application of the ordinance to plaintiffs is proper. Our task is to decide if the transit mitigation condition included the eventuality of the TIDF ordinance. We find that it did.

A. *The Transit Mitigation Condition Contemplated the Later Imposition of the TIDF*

■ The City maintains that the language of the transit mitigation condition was intended to include a funding mechanism such as the TIDF, which applies only to new office development and which is directed at recovering the anticipated cost of meeting the expanded transportation needs generated by that new development. Plaintiffs argue that it was

---

[7]The term "plaintiffs" as used in the remainder of this opinion refers only to Crocker and Pacific and not to Russ.

intended only to describe a funding mechanism which would include prior and present development in its sweep, not one directed solely at new development, and that for this and other reasons the TIDF is not a "downtown assessment district, or similar fair and appropriate mechanism" within the meaning of the condition. We find that while a mechanism which applies to both existing and new development certainly would be within the scope of the condition, nothing in the language compels a conclusion that the condition was intended to be so limited, or to exclude a mechanism such as the TIDF which applies only to new properties. Moreover, we find that the TIDF falls well within the range of funding mechanisms contemplated by the words "similar," "fair" and "appropriate."

■■■■ We apply familiar principles of statutory construction.[8] ■■ "We begin with the fundamental rule that a court 'should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.]" (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) "An equally basic rule of statutory construction is, however, that courts are bound to give effect to statutes according to the usual, ordinary import of the language employed in framing them." (*Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604 [45 Cal.Rptr. 512]; *Moyer, supra,* at p. 230.) "Although a court may properly rely on extrinsic aids, it should first turn to the words of the statute to determine the intent of the Legislature." (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) We also examine the history and background of the statute to discern the statutory objective. (*People* v. *Navarro* (1972) 7 Cal.3d 248, 273 [102 Cal.Rptr. 137, 497 P.2d 481].)

1. *The Language of the Condition Is Inclusive of the TIDF*

■■ We note at the outset that the condition was enacted "[i]n recognition of the need for expanded transportation services . . . generated by cumulative office development in the downtown area. . . ." (See *ante,* p. 844.) We find the trial court's analysis on this point persuasive: "The words 'need for expanded transportation services' connote that . . . additional transportation services would be required. [Italics omitted.] The words 'generated by cumulative office development' suggest that the additional

---

[8]The rules of statutory construction apply equally to the construction of ordinances. (*County of Madera* v. *Superior Court* (1974) 39 Cal.App.3d 665, 668 [114 Cal.Rptr. 283].) Thus they may be properly applied to resolutions of the Commission such as those at issue here, which, under the City's charter, are to be treated as if they were themselves ordinances. (*Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 186 Cal.App.3d 814, 826, fn. 7; S.F. Planning Code, § 174.)

services would be required because of new office development. When an EIR is prepared, a cumulative impact analysis is made defining the existing buildings and the transit demand they generated as the status quo baseline, against which the effect of the proposed project and cumulative impacts are measured. [Citations.][9] [¶] The transit mitigation condition goes on to provide for funds for 'maintaining and *augmenting* transportation service. . . .' The use of funds to augment transportation service contemplates the need for additional transit service as a result of new office construction.[10] Implicit in the language is a funding mechanism in the form of an ordinance that would address the cost of providing additional transit service required by new office development." (Italics in original.)

We next address the words "downtown assessment district, or similar fair and appropriate mechanism," and whether they encompass the TIDF. We conclude that they do.

■ A special assessment is "a charge imposed on particular real property for a local public improvement of direct benefit to that property. . . ." (*Solvang Mun. Improvement Dist.* v. *Board of Supervisors* (1980) 112 Cal.App.3d 545, 552 [169 Cal.Rptr. 391].) ■ An "assessment district" consists of the property or properties to be benefited by such improvement and to be specially assessed to bear the expense. (*Dawson* v. *Town of Los Altos Hills* (1976) 16 Cal.3d 676, 683 [129 Cal.Rptr. 97, 547 P.2d 1377]; see generally Improvement Act of 1911 (Sts. & Hy. Code § 5000 et seq.);

---

[9]The term "cumulative office development" is arguably susceptible of two interpretations. Webster's New International Dictionary (2d ed., unabridged) defines "cumulative" as: "1. Composed of accumulated parts; formed, or becoming larger, by gathering or successive additions. . . . [¶] 2. Subject to cumulation, that is to be, or may be, added. . . ." Plaintiffs urge us in effect to adopt the first of these definitions, which would support their reading that the funding mechanism contemplated was necessarily one addressed at mitigating the effects of "accumulated" (i.e., old *and* new) downtown office development. We find the second definition, however, more closely approximates the meaning of the word "cumulative" as employed in state environmental legislation. (See CEQA (Pub. Resources Code, § 21000 et seq.), § 21083, subd.(b); Guidelines for Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.), § 15355 (formerly § 15023.5); see also *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 68, 73-74, 79 [198 Cal.Rptr. 634].) Thus, like the trial court, we interpret the words "cumulative office development" to mean new or additional, as opposed to accumulated, office development.

This interpretation is further supported by the fact that even after the Commission had expressly endorsed the concept of a transit impact development fee (Com. Res. No. 8543 (Mar. 27, 1980) (see *post,* pp. 852-853)) it retained the "cumulative office development" language in later resolutions containing transit mitigation conditions. (See, e.g., Com. Res. No. 8647 (July 10, 1980).)]

[10]The resolutions' reference to a funding mechanism to provide funds for "maintaining" as well as "augmenting" transportation service is not inconsistent with this interpretation. New office projects will place additional burdens on maintenance of the transit system, and it will certainly be necessary to maintain the augmented service.

Municipal Improvement Act of 1913 (Sts. & Hy. Code § 10000 et seq.).) An assessment district is formed by local legislative resolution (*Dawson, supra*), and provides a compensating benefit to each affected property owner. (See *Spring Street Co.* v. *City of Los Angeles* (1915) 170 Cal. 24, 30 [148 P. 217].) Interested parties are afforded a hearing at which they may question any aspect of the proposed improvement, assessment or district, and a majority of affected property owners protesting the proposed improvement can ordinarily block the formation of a district, subject to a four-fifths majority override by the legislative body. (*Dawson, supra,* 16 Cal.3d at p. 683 and fn. 4.)

 The TIDF shares several key features with assessment districts. Like an assessment district, the TIDF applies to properties within a geographically defined area, the funds it generates are earmarked to offset demands created by the affected properties, it benefits those from whom the fee is collected (by facilitating public transportation to their office projects), and it is the product of the democratic process, having been adopted by the board of supervisors after public hearing.

Plaintiffs contest the significance of these similarities by pointing to certain marked differences between the typical assessment district and the TIDF. They argue that a transit fee that singles out new buildings is not at all similar to any assessment district existing when the permits were approved. They also maintain the TIDF is unlike typical assessment districts in that it is not calculated directly on the basis of the benefit received, it is a lump sum exaction rather than a monthly or annual assessment and it is based on a 45-year cost projection rather than on actual expenditures. Plaintiffs also point out that the TIDF ordinance does not permit the owners of the majority of the affected land to block the fee or the formation of the district if the board of supervisors fails to overrule them by a four-fifths vote. Finally, plaintiffs claim the TIDF must be viewed as dissimilar from an assessment district because its impact on them "exceeds manytimes the burden that any form of similar mechanism imposing monthly or annual charges upon all properties within its bounds would have imposed."

We find plaintiffs' argument unconvincing. "Similar" does not mean "identical." Funding devices which are "similar" will necessarily have some differences. We find the asserted differences between the two mechanisms under consideration insufficient to render them "dissimilar" within the meaning of the transit mitigation condition.

The TIDF is not dissimilar to an assessment district because it singles out new buildings. Assessment district funding mechanisms are not necessarily

applied to both existing and proposed buildings. In *J. W. Jones Companies v. City of San Diego* (1984) 157 Cal.App.3d 745, 758 [203 Cal.Rptr. 580], the Court of Appeal upheld a special assessment which was applicable only to new projects for the purpose of providing funds to build new or expanded public facilities. The fact that the special assessment in *Jones* was novel and was enacted after plaintiffs' projects were approved does not foreclose an interpretation that the conditions embrace mechanisms limited to new projects. At the time the Commission passed the resolutions no municipality in California had conditioned building permits on participation in a transit funding mechanism. Any mechanism the City ultimately developed would be novel. Plaintiffs should have anticipated being required to participate in any constitutionally permissible funding mechanism that fell within the broad language of the condition.

Nor do the remaining differences asserted by plaintiffs render the TIDF dissimilar to an assessment district. As would be the case with an assessment district, the benefit on which the TIDF is calculated is the value of increased transit service required to transport people to and from plaintiffs' projects. It is true the lump sum nature of the fee distinguishes it from a periodic assessment; however, inasmuch as the ordinance permits installment payments (see *ante,* p. 845, fn. 5) the TIDF is not significantly different from a funding mechanism requiring monthly or annual contributions, even if the total is based on projected rather than actual expenditures. Similarly insignificant is the fact that the TIDF ordinance lacks the majority protest provision generally associated with assessment districts, since plaintiffs were already foreclosed from any such attempt to block the fee by the condition's requirement that they "participate" in a funding mechanism. Finally, the financial burden of the TIDF is not dissimilar to that imposed by some assessment districts. As the trial court stated, "[h]ad an assessment district been formed to cover the cost of providing additional transit service attributable to new buildings[,] with only those new buildings . . . being assessed, logic would suggest that the cost would be essentially the same as the TIDF."[11] In any case, even if the TIDF imposed a somewhat greater financial burden on plaintiffs than other funding mechanisms, financial burden is only one of many features to be considered. We conclude that the TIDF funding mechanism is similar to an assessment district within the meaning of the conditions.

---

[11] The trial court found that the TIDF was less than the cost of the increased services required by the new office developments. This finding was upheld on appeal and is not within our scope of review.

:

## 2. The History and Background of the Transit Mitigation Condition and Extrinsic Evidence of the Commission's Intent Also Suggest the Intended Inclusion of the TIDF

 Our reading of the transit mitigation condition is also supported by its history and background. The trial court found, based on a stipulation of the parties, that "the transportation mitigation conditions were included in [p]laintiffs' permits in response to an adverse environmental impact on transportation identified in the [EIR] for both [p]laintiffs' properties." (See *ante,* p. 844.) It is undisputed that the Commission's authority extends only to new developments and to those existing properties for which new developments or uses have been proposed. Thus it would be incongruous to conclude that when the Commission demanded that plaintiffs participate in a transit funding mechanism to mitigate the adverse transit impacts identified in the EIR's, it intended to exempt plaintiffs from any later-established transit mitigation measure which, unlike a typical assessment district, did not apply to existing buildings. Rather, the background of the transit mitigation condition suggests that the Commission intended it to include funding mechanisms that would require new office developments to help finance the cost of the additional transit service attributable to those projects.

Evidence from the Commission's own records also indicates that at the time it was enacted the transit mitigation condition language was intended to encompass whatever financing mechanism would be developed as a result of the City's ongoing study of the transit funding problem. At the public hearing on August 9, 1979, for the final EIR for the Pacific project, Commissioner Dearman observed that both Crocker and Pacific had stated they were willing to participate in a transit funding mechanism and asked why something was not being done if the developers were willing. Mr. Green, a senior member of the City planning department who helped draft the condition, responded as follows: "There are a number of ways to implement a special assessment district or some form of mechanism for providing funds for improved transit service in the downtown area. We couldn't really get into the range of options or I can't tell even what the necessary Board of Supervisors' action would be. [¶] What we do need to do is a fairly detailed legal study basically to see exactly what our options are and then present an ordinance to the Board for approval—and we don't see that happening for a good six months to a year primarily because we don't have the funds to do

that particular study." (Transcript of Proceedings of the Reg. Meeting of the S.F. City Planning Com. (Aug. 9, 1979) p. 10.)[12]

Commission action subsequent to its passage of the resolutions approving plaintiffs' permits also indicates that it intended the transit mitigation condition to include a range of funding devices broad enough to encompass the TIDF. On March 27, 1980, the Commission passed a resolution endorsing a transit impact development fee then being considered by the board of supervisors. The resolution states: "[whereas], [t]he City Planning Commission has required, as a condition of approval in seven recent development proposals [including plaintiffs'] . . . , that developers participate in a fair and appropriate mechanism to provide funds for maintaining and augmenting mass transit services, should such a mechanism be established by the City; and [¶] [whereas], [t]he Board of Supervisors is now considering a proposed [o]rdinance . . . directing the PUC to establish a transit impact development fee to recover the cost of operation and maintenance of additional public transit service in the downtown area . . . ; [¶] . . . the City Planning Commission hereby endorses the concept of legislation which would establish reasonable fees on new . . . structures in the downtown area to help defray the additional costs of public transit resulting from occupancy of the new structures. . . ." (Com. Res. No. 8543 )[13] Although the resolution does not explicitly state that the Commission intended its earlier-imposed transit mitigation conditions to embrace such a development fee, it does show the Commission's understanding six to eight months later that development fees fall within the conditions. ■ While "subsequent legislation interpreting [a] statute . . . [cannot] change the meaning [of the earlier enactment,] it [does] suppl[y] an indication of the legislative intent which may be considered together with other factors in arriving at the true intent existing at the time the legislation was enacted.' [Citation.]" (*West Pico Furniture*

---

[12] The notion of funding the municipal railway system through an assessment district appears to have originated with the San Francisco Public Utilities Commission (PUC). In December 1978, it was suggested in a PUC hearing on municipal railway fares and revenues that a downtown assessment district be established to help fund the system. In January 1979 the consulting firm that had convened this hearing reported that an assessment district was the only currently apparent source of significant funding. The consultant's May 1979 report again identified a financial district assessment district as one proposal for generating revenues for the system. It was not until February 1, 1982, however, some nine months after the TIDF ordinance was enacted, that the board of supervisors adopted a resolution declaring its intent to form a "Core Area Transit Maintenance District" embracing all commercial downtown properties, both office and nonoffice, existing and new. (Bd. of Supervisors Res. No. 45-82.) That district was never formed.

[13] The proposed ordinance endorsed by Resolution No. 8543 would have imposed a development fee not only on new office developments but on all new commercial downtown property development. Nevertheless, it is sufficiently similar to the ordinance ultimately enacted to suggest that the Commission also would have endorsed the TIDF if the board of supervisors had proposed it at that time.

*Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 610 [86 Cal.Rptr. 793, 469 P.2d 665].) Thus Resolution No. 8543 supports our conclusion that the TIDF is within the range of mechanisms contemplated by the transit mitigation conditions.[14]

**B. *Plaintiffs Had No Greater Vested Rights Than Those Granted Them Under The Permits***

Failing their narrow reading of the transit mitigation condition, plaintiffs argue that it is not the intent of the language but rather what plaintiffs understood it to provide which is dispositive of their claim. According to plaintiffs, their vested rights to develop their projects were limited by the condition only to the extent its language provided "notice . . . of such nature as reasonably to convey the required information . . . ." (*Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652]; see also *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 612-619 [156 Cal.Rptr. 718, 596 P.2d 1134].) They insist that the language of the condition is ambiguous and alerted them only to the possibility of a downtown-wide assessment district, including both new and existing office space, which would require annual recoupments of costs actually incurred. Thus, according to plaintiffs, application of the TIDF to their projects violates their constitutional right to due process.

We reject this argument. A vested right requires more than a good faith subjective belief that one has it. (See *Avco, supra,* 17 Cal.3d at p. 797.) When a legislative body gives a private party a limited right, the party is not exempted from the limitation merely because it is phrased ambiguously. (Cf. *Atkins* v. *Parker* (1985) 472 U.S. 115, 131 [86 L.Ed.2d 81, 94, 105 S.Ct. 2520].) Ambiguous enactments are subject to construction according to established rules, and while a vested right may protect a party from future enactments it provides no protection against the appropriate application of those rules to the enactment that created the right.

Plaintiffs also advance an estoppel argument (*Raley* v. *California Tahoe Regional Planning Agency* (1977) 68 Cal.App.3d 965, 974-975 [137 Cal.Rptr. 699]), which we similarly reject. While it is true that the

---

[14] Plaintiffs argue that another post-permit event is more probative of the Commission's intent. In July 1980, the Commission enacted the first of a series of transit mitigation conditions containing no reference to a "downtown assessment district, or similar fair and appropriate mechanism." (See Com. Res. No. 8647 (July 10, 1980).) Rather than reflecting on the Commission's intent in 1979, however, this change is explained by the fact that by mid-1980 the Commission was aware of legal difficulties in establishing an assessment district and the board of supervisors was actively promoting the concept of a development fee.

vested rights doctrine is "predicated upon estoppel of the governing body'" (*Avco, supra,* 17 Cal.3d at p. 793), "[a]n equitable estoppel requiring the government to exempt a land use from a subsequently imposed regulation must include (1) a promise such as that implied by a building permit that the proposed use will not be prohibited by a class of restrictions that includes the regulation in question and (2) reasonable reliance on the promise by the promisee to the promisee's detriment. [*Ibid.*]" (*Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858,. 867 [201 Cal.Rptr. 593, 679 P.2d 27].) In this case, as we have found, the government's "promise" was limited by the transit mitigation condition. To the extent plaintiffs relied on their own self-serving interpretation of the condition, such reliance must be considered unreasonable.

## III. CONCLUSION

At the time the Commission authorized plaintiffs' building permits, plaintiffs understood that they would be required to pay some amount to fund increased transit demands as a condition to developing their properties. The TIDF is consistent with the language of the condition. While the TIDF is not an assessment district, it is a "similar fair and appropriate" transit funding mechanism. It is "similar" because it shares many features with assessment districts and because it requires plaintiffs to pay the costs of the increased transit demand generated by their new office developments; it is "fair" because it was democratically enacted by the board of supervisors and applies without distinction to all new downtown office projects; and it is "appropriate" because it serves the purposes contemplated by the transit mitigation condition.

The history of the condition confirms that its purpose was to require developers to fund the increased transit demands generated by their projects. The TIDF mechanism is consistent with this purpose. This interpretation is further supported by extrinsic evidence of the Commission's intent.

As the trial court observed, plaintiffs' vested rights are "no greater than those specifically granted by the permit[s themselves]. [Citation.] Given the transit mitigation condition in their permits, [p]laintiffs were required to participate in some mechanism to be established by the C[ity]. To exempt [p]laintiffs from the TIDF [o]rdinance would give them greater rights than those granted by their permits." We therefore conclude that application of the TIDF ordinance to plaintiffs does not impair their vested rights.

The judgment of the Court of Appeal is reversed as to plaintiffs Crocker and Pacific and affirmed in all other respects. The Court of Appeal shall

order those sections of its opinion which do not address the issues disposed of herein to be published in the Official Reports. (Cal. Rules of Court, rule 976(d); see *Agricultural Labor Relations Board* v. *Tex-Cal Land Management, Inc.* (1987) 43 Cal.3d 696, 709, fn. 12.)[15]

Mosk, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

LUCAS, C. J.—I respectfully dissent.

Although I believe that the Transit Impact Development Fee Ordinance (TIDF) may well be constitutionally valid (an issue not presently before us), I cannot agree plaintiffs were provided adequate notice of the imposition of such a fee in their building permits.

The majority relies heavily on the planning commission's records which apparently indicate that "at the time it was enacted the transit mitigation condition language was intended to encompass whatever financing mechanism would be developed as a result of the City's ongoing study of the transit funding problem." (Majority opn. at p. 851.) The commission's intent, however, is irrelevant to the issue of the adequacy of plaintiffs' notice. By stating that plaintiffs "shall participate in a downtown assessment district, or similar fair and appropriate mechanism," the permit language alerted plaintiffs only to the possibility that some fee similar to the assessment generated by a downtown-wide assessment district, applicable to preexisting and new development, could be levied on their projects. I disagree with the majority that the TIDF, which applies only to new buildings and essentially demands from plaintiffs the lion's share of the costs for the increased transit fee over the next 45 years, was contemplated by the ambiguous language of the permits.

Similarly, the majority's reliance on the additional notice implied by public reaction to plaintiffs' draft environmental impact reports is misplaced. In their final reports, plaintiffs simply responded to public concern by recognizing the need for additional public transit services to meet increased public demand generated by "cumulative office development" in the downtown area. Here, plaintiffs agreed to "contribute to funds for maintaining and augmenting transit service, in an amount proportionate to the

---

[15]Specifically, the court shall not publish part V of its majority opinion, references to the "retroactivity" issue in the first and last paragraphs of the majority opinion, or any of the concurring and dissenting opinion except the first sentence. The court also is directed to correct a typographical error in the majority opinion by changing the "$6-per-square-foot" reference in part VI(D)(4) to "$.60-per-square-foot."

demand created by this project, through a funding mechanism, such as a special assessment district, if such a mechanism is developed by the City." As the Court of Appeal stated: "The environmental impact report[s] gave plaintiffs no more information than the language in the building permits, which . . . was too general to support this type of exaction."

Accordingly, I agree with the Court of Appeal's conclusion that, "Since the entire downtown area is affected by the peak demand in ridership, it would be unreasonable to expect plaintiffs to anticipate that only a few [new] office buildings would be covered by the funding mechanism. [I] do not think the words 'similar, fair and appropriate mechanism' reasonably could be construed to include the exclusive funding mechanism of the type in effect here. When a vested right is implicated, due process requires that notice be meaningful or 'of such nature as reasonable to convey the required information. . . .'" (Quoting *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306, 314 [94 L.Ed. 865, 873, 70 S.Ct. 652].) Neither the planning commission's uncommunicated intent nor the environmental impact report gave plaintiffs reasonable notice as a matter of law that they would be required to pay the large fee imposed by the TIDF. I therefore agree with the Court of Appeal that the retroactive application of the ordinance to plaintiffs' project is unconstitutional.

I would affirm the judgment of the Court of Appeal in its entirety.