[No. D021478. Fourth Dist., Div. One. Sept. 10, 1996.]

KENNETH W. DAVIDSON, Plaintiff and Respondent, v.
COUNTY OF SAN DIEGO et al., Defendants and Appellants.

## COUNSEL

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Valerie Tehan, Deputy County Counsel, for Defendants and Appellants.

Worley, Schwartz, Garfield & Rice and Donald R. Worley for Plaintiff and Respondent.

## OPINION

**HALLER, Acting P. J.**—The County of San Diego, Board of Supervisors of San Diego County and Lauren M. Wasserman, director of the county's department of planning and land use (collectively County) appeal from a judgment in favor of Kenneth W. Davidson, directing the County to process Davidson's application for a building permit for a crematorium under the regulations effective when the application was made. The trial court found a zoning ordinance conferred vested rights at the time Davidson applied for the building permit; and as a matter of law, the County could not apply new regulations to Davidson's project. We conclude the court erred because vested rights may be impaired by subsequent police power enactments reasonably necessary to protect the public's health and safety.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1981, the County enacted San Diego County Zoning Ordinance[1] section 1019, subdivision a, which stated:

"EFFECT OF AMENDMENTS UPON PENDING APPLICATIONS

"a. Any application for a permit or other approval regulated in any manner by the provisions of this Zoning Ordinance shall only be required to meet the

---

[1]All "section" references are to the San Diego County Zoning Ordinance unless otherwise specified.

provisions of this Ordinance that were in effect on the date that application is filed."

Before Davidson bought property in Spring Valley (zoned M54), he determined section 1019, subdivision a and other County regulations required only site plan approval and a building permit before constructing a crematorium. Davidson wrote to the County requesting it confirm his belief, which it did. He then paid an architect and engineers to prepare plans for construction of a crematorium.

When Davidson sought a waiver of site plan review, the County referred the matter to the Spring Valley Community Planning Group (Group), which advised the County on zoning issues on an ad hoc basis. The Group held a two-hour hearing on May 25, 1993, during which "there was spirited, vocal opposition to installation of a crematorium" on Davidson's property. On June 8, 1993, the Group held another lengthy meeting, during which it denied Davidson's request for site plan review waiver.

The county board of supervisors (Board) learned in May or June 1993 there were two or three crematoriums proposed in Spring Valley. A June 30, 1993 report by the County's planning commission stated:

"In recent months three crematorium proposals have surfaced involving M54 locations in the unincorporated County. These uses have previously been uncommon in the County areas. Public reaction to these proposals has been negative, with widespread concern raised regarding: 1) the potentially high nuisance characteristics of these uses; and 2) the lack of control the County will have over such uses since no discretionary permit regulating their operations is required.

"The present Zoning Ordinance allowance of crematoriums by right without a discretionary review in the M54 zone does not allow the County to regulate the performance of these uses or mitigate their impacts to the community. Allowing crematoriums upon approval of a Major Use Permit (as is the case in eight other zones at present) would permit the County to scrutinize such facilities and impose appropriate conditions to ensure that they will not become a nuisance to neighboring properties." On the same date, the Board approved the request of Supervisors Leon Williams and Dianne Jacob to have staff prepare an ordinance amending existing zoning regulations to require a major use permit for a crematorium in the M54 zone.

Davidson submitted site plans and filed an application for a crematorium building permit on July 8, 1993.

On July 14, 1993, the Board held a hearing to consider a moratorium prohibiting applications for or issuance of permits for crematoriums in the M54 zone, pending adoption of the major use permit requirement. Minutes from the meeting state:

"The Public Health and Safety findings supporting the adoption of the proposed Urgency Moratorium Ordinance are the following: certain proposed crematoriums in the M54 Use Regulations may have nuisance impacts on the surrounding neighborhood due to the potential for particulate and odor emissions and psychological distress arising from the handling and cremation of human remains in the proximity of existing residences.

"The San Diego Air Pollution Control District has been contacted regarding the nature of crematorium emissions. The engineer that processes APCD permits for crematoriums informed [department of planning and land use] staff that although crematoriums are designed for complete combustion of human remains, small amounts of fine particulate matter and combustion gasses are emitted from even well-run operations. Such emissions are legal at low levels and are normally not visible except occasionally for a few seconds at the time of operation start-up. However, visible and/or excessive emissions can occur at times of equipment failure or operator error. Also, odors may occasionally occur if crematorium combustion processes [are] not operating properly. APDC also stated it is possible for small amounts of fine ash to fall out on nearby property, although it is usually not visually noticeable. Small amounts of toxic emissions can also occur at some crematoriums due to combustion of materials such as plastics."

Several members of the public spoke at the hearing. Among them were a man living approximately 80 feet east of Davidson's proposed crematorium, who voiced concerns over the amount of smoke emanating from a crematorium in Lakeside, and a woman living either 800 feet or yards from a crematorium in Los Angeles, who stated her eyes burned and "you can actually taste the fumes. I have to have gum beside my bed . . . because you inhale it and you wind up tasting it, you're coughing, you're choking, your eyes are burning."

The Board adopted a moratorium on accepting applications or approving pending applications for crematorium building permits and directed counsel to determine whether pending applications for crematoriums could be made subject to new regulations in light of section 1019, subdivision a. On July 21, 1993, the Board enacted a provision requiring a major use permit for a crematorium in the M54 area. (§ 2545, subd. b.)

The County refused to process Davidson's permit application until he applied for and received a major use permit. On August 5, 1993, Davidson

filed a complaint for declaratory relief and a petition for writ of mandate, seeking an order compelling the County to consider his building permit application in light of those regulations in existence at the time of the application.

On October 27, 1993, the Board adopted section 2585, subdivision b, which prohibited a crematorium from being placed less than 650 feet from a residence. On the same date, the Board adopted section 6907, subdivision b, which stated: "Exception to Section 1019. Notwithstanding Section 1019, no application for a building permit for a Funeral and Interment Services: Cremating use type shall be accepted or approved where the proposed use or facility would violate Section 2545(b) [major use permit requirement] or Section 2585(b) [650-foot setback from residential property]." Apparently Davidson could not comply with the 650-foot setback requirement, but would had to have obtained a variance from that requirement.

The case was tried before the court on May 20, 1994, and the court issued its judgment and order on June 3, 1994. It stated in part:

"It is undisputed that Davidson filed his building permit application on July 8, 1993; while Zoning Ordinance section 1019 was in full force and effect and before any subsequent Zoning Ordinance amendments regarding crematoriums went into effect.

"I find as a matter of law that the Board of Supervisors did not have the authority to circumvent the express language of section 1019 by retroactively applying a Zoning Ordinance amendment creating an exception to section 1019 for crematoriums to Davidson's pending application. Although the Administrative Record reflects that the Board of Supervisors was motivated by concerns for the health, welfare and safety of the public, I find that, *under any circumstances, those concerns would not be sufficient to override the rights expressly conferred upon an applicant by Zoning Ordinance section 1019*, and rights vested in Davidson by his reliance upon and compliance with section 1019. While Davidson has presented a viable argument that the application of the exception to section 1019 would constitute unlawful discrimination, the Court finds it unnecessary to reach that issue in light of its decision on section 1019." (Italics added.) The court issued a peremptory writ of mandate directing the County "to process . . . Davidson's site plan and building permit applications according to the ordinances and regulations in existence when Davidson filed his building permit application on July 8, 1993."

On appeal, the County contends the court erred because a public entity cannot abdicate its future exercise of police power where necessary to

protect the public. We agree and conclude section 1019, subdivision a did not preclude the County as a matter of law from retroactively applying the major use permit or 650-foot setback requirements to Davidson's project.

<br /><br />

DISCUSSION

### I. *Vested Rights in the Land-use Context*

■ Governmental agencies may generally apply new laws retroactively where such an intent is apparent. (See *In re Marriage of Buol* (1985) 39 Cal.3d 751, 756 [218 Cal.Rptr. 31, 705 P.2d 354].) Retrospective application may be unconstitutional, however, if it deprives a person of a vested right without due process of law. (*Rosefield Packing Co.* v. *Superior Court* (1935) 4 Cal.2d 120, 122 [47 P.2d 716].)

■ *Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 791-799 [132 Cal.Rptr. 386, 553 P.2d 546] (*Avco*), sets forth the judicial vested rights doctrine as applied to land use: "It has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he [or she] acquires a vested right to complete construction in accordance with the terms of the permit. [Citations.] Once a landowner has secured a vested right the government may not, by virtue of a change in the zoning laws, prohibit construction authorized by the permit upon which he [or she] relied." (*Id.* at p. 791.) The court held, "neither the existence of a particular zoning nor work undertaken pursuant to governmental approvals preparatory to construction of buildings can form the basis of a vested right to build a structure which does not comply with the laws applicable at the time a building permit is issued." (*Id.* at p. 793.) "[T]he rights which may 'vest' through reliance on a government permit are no greater than those specifically granted by the permit itself. [Citations.]" (*Santa Monica Pines, Ltd.* v. *Rent Control Board* (1984) 35 Cal.3d 858, 866 [201 Cal.Rptr. 593, 679 P.2d 27].)

Absent equitable estoppel, upon which the judicial vested rights doctrine is based, a governmental agency may change requirements late into the development process in spite of the property owner's expenditure of substantial sums.[2] In 1979, in order to ameliorate the harsh result of *Avco*, the Legislature enacted a statute establishing a property development agreement

---

[2]For instance, in *Avco*, the developer, after receiving a zoning approval, final subdivision map and rough grading permit, spent over $2 million installing storm drains, streets, culverts and utilities and incurred liabilities of another $740,000. Nonetheless, the court held there was no vested right since the developer had no building permit. In *Oceanic California, Inc.* v.

procedure (Gov. Code, §§ 65864-65869.5). (Curtin, Cal. Land Use and Planning Law (16th ed. 1996), p. 178.) "[D]evelopment agreements . . . between a developer and a local government limit the power of that government to apply newly enacted ordinances to ongoing developments. Unless otherwise provided in the agreement, the rules, regulations, and official policies governing permitted uses, density, design, improvement, and construction are those in effect when the agreement is executed ([Gov. Code,] § 65866)." (*City of West Hollywood* v. *Beverly Towers, Inc.* (1991) 52 Cal.3d 1184, 1193, fn. 6 [278 Cal.Rptr. 375, 805 P.2d 329].)

As another solution to *Avco*, the Legislature in 1984 established a new procedure for obtaining a "vesting tentative map" (Gov. Code, §§ 66498.1-66498.9) when the Subdivision Map Act requires the filing of a tentative map. (See Gov. Code, § 66474.2, subd. (a).) "The most notable feature of a vesting tentative map is that on its approval or conditional approval, the right vests in the subdivider to proceed with development in 'substantial compliance with the ordinances, policies and standards' in effect on the date on which the subdivider's application was deemed complete." (*Bright Development* v. *City of Tracy* (1993) 20 Cal.App.4th 783, 788 [24 Cal.Rptr.2d 618].)

Local ordinances may also confer vested rights earlier than available under the judicial doctrine. For instance, *Russian Hill Improvement Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 34 [56 Cal.Rptr. 672, 423 P.2d 824], concerned a City and County of San Francisco enactment "immunizing outstanding [building] permits from subsequent changes in the zoning ordinances . . . ." (*Id.* at p. 38.) In other words, the provision gave developers vested rights upon receiving a valid building permit, as opposed to having to spend substantial sums in reliance on the permit prior to obtaining such rights.

## II. *Davidson's Vested Rights Under Section 1019(a)*

 The County argues Davidson had no vested rights because "[r]ights conferred by section 1019 are derived from the police power and can be taken away pursuant to the police power." The determination of whether Davidson had vested rights, however, is not made by looking at the effect of

---

*North Central Coast Regional Com.* (1976) 63 Cal.App.3d 57 [133 Cal.Rptr. 664], the court held the developer had no vested rights even though it had spent almost $27 million in subdividing 2,000 lots.

the County's subsequent enactments but is made as of the time he applied for the building permit.[3]

The County alternatively asserts *Avco* applies, and since Davidson did not obtain a building permit prior to the new crematorium regulations, he was subject to the more restrictive requirements. *Avco* is inapplicable as we are not concerned with whether Davidson had a vested right under the judicial doctrine, which he did not, but with whether section 1019, subdivision a conferred a vesting earlier than available under the *Avco* doctrine.

■ A court must " 'give effect to statutes according to the usual, ordinary import of the language employed in framing them.' [Citation.]"[4] (*Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839, 847 [244 Cal.Rptr. 682, 750 P.2d 324].) ■ While normally a developer must comply with regulations adopted after application for a building permit (*Avco*, *supra*, 17 Cal.3d at p. 795), the clear language of section 1019, subdivision a shows it was intended to confer the vested right to have a building permit application reviewed and considered in light of the regulations existing on the date of application. We thus conclude Davidson had such a vested right when he applied for the building permit.

### III. Vested Rights May Be Impaired Through Subsequent Police Power Enactments Necessary to Protect Public Health or Safety

The County contends even if Davidson had a vested right, section 1019, subdivision a did not prohibit it as a matter of law from enacting new crematorium regulations necessitated by public health and safety concerns. We agree.

■ A governmental entity may not, through contract or legislation, abdicate its police power. (*Carty* v. *City of Ojai* (1978) 77 Cal.App.3d 329, 342 [143 Cal.Rptr. 506].) It is well settled in California that public entities may impair vested rights where necessary to protect the health and safety of the public. As held by our high court: "Retroactive legislation, though frequently disfavored, is not absolutely proscribed. The vesting of property rights, consequently, does not render them immutable: ' "Vested rights, of course, may be impaired 'with due process of law' under many circumstances. The state's inherent sovereign power includes the so-called 'police power' right to interfere with vested property rights whenever reasonably

---

[3] We note that under the County's analysis, a property owner could virtually never obtain vested rights immunizing it against subsequent changes in development regulations.

[4] This rule applies equally to the construction of local ordinances. (*County of Madera* v. *Superior Court* (1974) 39 Cal.App.3d 665, 668 [114 Cal.Rptr. 283].)

necessary to the protection of the health, safety, morals, and general well being of the people. . . . The constitutional question, on principle, therefore, would seem to be, not whether a vested right is impaired [by a change in the law], but whether such a change reasonably could be believed to be sufficiently necessary to the public welfare as to justify the impairment." ' [Citations.]" (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 592 [128 Cal.Rptr. 427, 546 P.2d 1371], fns. omitted.)

The vested rights doctrine in the land use context "is subject . . . to the qualification that such a vested right, *while immune from divestment through ordinary police power regulations, may be impaired or revoked if the use authorized or conducted thereunder constitutes a menace to the public health and safety or a public nuisance.* [Citations.]" (*Highland Development Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 169, 186 [215 Cal.Rptr. 881] (italics added), disapproved on other grounds in *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [872 P.2d 143].) Public welfare demands may even require the complete destruction of vested property rights. (*Sunset Amusement Co.* v. *Board of Police Commissioners* (1972) 7 Cal.3d 64, 80 [101 Cal.Rptr. 768, 496 P.2d 840].)

■ The appropriate inquiry is whether the new regulations imposed by the County on Davidson's project were " ' "sufficiently necessary to the public welfare as to justify the impairment." ' " (*In re Marriage of Bouquet, supra*, 16 Cal.3d at p. 592.) ■ "Probably the single most important factor to be considered in determining whether a particular impairment is constitutionally permissible is the nature and extent of the impairment. 'The severity of the impairment measures the height of the hurdle the . . . legislation must clear.' [Citations.] Other important factors to be considered are the nature, importance and urgency of the interest to be served by the challenged legislation; and whether the legislation was appropriately tailored and limited to the situation necessitating its enactment. [Citations.]" (*Donlan* v. *Weaver* (1981) 118 Cal.App.3d 675, 682 [173 Cal.Rptr. 566].)

■ Davidson asserts an owner with vested rights under a development agreement or vesting tentative map is immune from subsequent police power regulations no matter what their purpose, and by analogy the same protection is afforded by section 1019, subdivision a. He fails to acknowledge, however, that notwithstanding the rights created by either a development agreement or a vesting tentative map, the local agency may apply subsequent regulations to the project if it determines failure to do so would create a condition dangerous to the public health or safety. (Gov. Code, §§ 65865.3, subd. (b) & 66498.1, subd. (c)(1).)

The usual exercises of police power in the land use context are not directly related to danger or potential danger to the health and safety of the public.

For instance, ordinances or regulations down-zoning from one use to another, limiting subdivision densities, or imposing height requirements would not ordinarily be so related. Davidson had the right to have his building permit application processed without consideration of any such later-enacted provisions. We conclude, however, the trial court erred in finding as a matter of law the County could under no circumstances apply the major use permit and 650-foot setback requirements to Davidson's pending permit. To the contrary, the regulations could be applied to Davidson's project if they were reasonably necessary to prevent the operation of a crematorium from being a danger or nuisance to the public.[5]

### DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for a new trial on the issue of whether the County's major use permit and 650-foot setback requirements were sufficiently necessary to the public welfare to justify impairment of Davidson's vested rights. Davidson to bear costs on appeal.

McDonald, J., and Pate (W. C.), J.,* concurred.

Respondent's petition for review by the Supreme Court was denied December 18, 1996.

---

[5]We do not reach Davidson's argument that application of the new regulations to his project would constitute unlawful discrimination. The trial court found it unnecessary to reach that issue, and Davidson may raise it on retrial.

*Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.