[No. S161190. Mar. 15, 2010.]

COMMUNITIES FOR A BETTER ENVIRONMENT, Plaintiff and Appellant, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al., Defendants and Respondents;
CONOCOPHILLIPS COMPANY, Real Party in Interest and Respondent.

CARLOS VALDEZ et al., Plaintiffs and Appellants, v.
SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT et al., Defendants and Respondents;
CONOCOPHILLIPS COMPANY, Real Party in Interest and Respondent.

312

COUNSEL

Adrienne L. Bloch, Shana Lazerow; Lozeau|Drury and Richard T. Drury for Plaintiff and Appellant Communities for a Better Environment.

Richard M. Frank; Adams Broadwell Joseph & Cardozo, Marc D. Joseph and Richard T. Drury for Plaintiffs and Appellants Carlos Valdez et al.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Tom Greene and Dane R. Gillette, Chief Assistant Attorneys General, Theodora P. Berger and Pamela C. Hamanaka, Assistant Attorneys General, Sally Magnani Knox, Lisa Trankley and Susan L. Durbin, Deputy Attorneys General for State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Luke Cole for Association of Irritated Residents, California Communities Against Toxics, California Environmental Rights Alliance, California Safe Schools, Center on Race, Poverty & the Environment, Coalition for a Safe Environment, Community Water Center, TriCounty Watchdogs and Youth United for Community Action as Amici Curiae on behalf of Plaintiffs and Appellants.

Frank G. Wells Environmental Law Clinic and Sean B. Hecht for Sierra Club, Endangered Habitats League, Natural Resources Defense Council and Planning and Conservation League as Amici Curiae on behalf of Plaintiffs and Appellants.

Kurt R. Wiese, Barbara Baird; Woodruff, Spradlin & Smart, Bradley R. Hogin, Edward L. Bertrand and Ricia R. Hager for Defendants and Respondents.

Lewis Brisbois Bisgaard & Smith, Daniel V. Hyde, Paul J. Beck and Azusa K. Tokudome for California Association of Sanitation Agencies as Amicus Curiae on behalf of Plaintiffs and Appellants.

Latham & Watkins, Robert A. Wyman, Jr., and Emily Taylor for Regulatory Flexibility Group as Amicus Curiae on behalf of Defendants and Respondents.

Weston Benshoof Rochefort Rubalcava & MacCuish, Alston & Bird, Ward L. Benshoof, Jocelyn D. Thompson; Cox Castle & Nicholson and Michael H. Zischke for Real Party in Interest and Respondent.

Diepenbrock Harrison, Mark D. Harrison and Dan M. Silverboard for California Construction and Industrial Materials Association as Amicus Curiae on behalf of Real Party in Interest and Respondent.

Manatt, Phelps & Phillips and Michael M. Berger for Western Independent Refiners Association as Amicus Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong and David R. Farabee for Western States Petroleum Association as Amicus Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

Kronick Moskovitz Tiedemann & Girard, P. Addison Covert, Robin Leslie Stewart and Stacy L. Asato Toledo for California School Boards Association as Amicus Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

Brownstein Hyatt Farber Schreck and Lisabeth D. Rothman for California Building Industry Association as Amicus Curiae on behalf of Defendants and Respondents and Real Party in Interest and Respondent.

OPINION

**WERDEGAR, J.**—The California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[1] requires a public agency to prepare an environmental impact report (EIR) only on projects that may have significant environmental effects (§§ 21100, subd. (a), 21151, subd. (a)). To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the "baseline" for environmental analysis. According to an administrative guideline for CEQA's application, the baseline "normally" consists of "the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is commenced . . . ." (Cal. Code Regs., tit. 14, § 15125, subd. (a).)

---

[1] All further unspecified statutory references are to the Public Resources Code.

In the present case, ConocoPhillips Company (ConocoPhillips), the private proponent of a project to conduct a new industrial process at a petroleum refinery, and the South Coast Air Quality Management District (District), whose failure to prepare an EIR before approving the refinery project is at issue, contend that the existence of valid permits to operate industrial equipment used in the project at particular levels establishes an exception to the general rule that existing physical conditions serve as the baseline for measuring a project's environmental effects. Instead, they maintain, the analytical baseline for a project employing existing equipment should be the maximum permitted operating capacity of the equipment, even if the equipment is operating below those levels at the time the environmental analysis is begun. Failure to use the maximum permitted operations as a baseline, they argue, would contravene CEQA's statute of limitations and deprive the permitholder of its vested rights.

We conclude neither the statute of limitations, nor principles of vested rights, nor the CEQA case law on which ConocoPhillips and the District rely justifies employing as an analytical baseline for a new project the maximum capacity allowed under prior equipment permits, rather than the physical conditions actually existing at the time of analysis. The District therefore abused its discretion in determining the project at issue would have no significant environmental effects compared to a baseline of maximum permitted capacity. We leave for the District on remand, however, to resolve exactly how the existing physical conditions—assertedly subject to operational variation over time—should be measured.

### FACTUAL AND PROCEDURAL BACKGROUND

Real party in interest ConocoPhillips operates a petroleum refinery in Wilmington, an area of the City of Los Angeles. The refinery, occupying approximately 400 acres bordering commercial, recreational, and residential areas, produces gasoline, jet fuel, diesel fuel, and other chemical products. The present dispute arises from ConocoPhillips's project to produce ultralow sulfur diesel fuel.

Plaintiffs are Communities for a Better Environment (an environmental organization), Southern California Pipe Trades District Council 16 and Steamfitters & Pipefitters Local 250 (labor organizations), and Carlos Valdez and other individuals. The individual plaintiffs and members of the plaintiff organizations live and/or work near the ConocoPhillips refinery.

Defendant District is the agency responsible for regulating nonvehicular air pollution in the South Coast Air Basin, an area encompassing all of Orange County and portions of San Bernardino, Riverside, and Los Angeles Counties, including the Wilmington area. (Health & Saf. Code, §§ 40000, 40410; Cal. Code Regs., tit. 17, § 60104.)

In 2000 and 2001, the District, the federal Environmental Protection Agency, and the California Air Resources Board issued regulations requiring a reduction by mid-2006 in the sulfur content of motor vehicle diesel fuel to 15 parts per million by weight. These rules were designed to reduce the harmful environmental effects resulting from emissions of sulfur oxides and other toxins from diesel-fueled motor vehicles.

To comply with these regulations, ConocoPhillips developed plans for an Ultra Low Sulfur Diesel Fuel Project (the Diesel Project), which involved replacing or modifying hydrotreater reactors, a cooling tower, storage tank, and compressor; installing new pipelines and pumps; and substantially increasing operation of the existing cogeneration plant and four boilers, which provide steam for refinery operations. The cogeneration plant and boilers were subject to prior permits that state a maximum rate of heat production for each piece of equipment.

ConocoPhillips applied to the District for a permit to construct the above modifications. After completing an initial study to determine the environmental impacts of the proposed Diesel Project, the District presented the results of its investigation in a draft negative declaration, concluding the project did not have the potential to adversely affect the environment.

Plaintiffs submitted comments on the draft negative declaration, arguing the Diesel Project *would* have significant adverse impacts on the environment and thus an EIR should be prepared to identify mitigation measures. One of plaintiffs' experts estimated the project would increase nitrogen oxide (NOx) emissions by as much as 661 pounds per day, greatly exceeding the District's significance threshold of 55 pounds per day.[2] NOx is a major contributor to smog formation and can cause adverse health effects, especially aggravation of respiratory disease.

---

[2] CEQA regulations encourage public agencies to develop and publish thresholds of significance, levels of a particular environmental effect "non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (Cal. Code Regs., tit. 14, § 15064.7, subd. (a).) The District's threshold for operational NOx emissions is 55 pounds per day.

The District determined that increased steam generation from the cogeneration plant and boilers, along with other new activities, would create an additional 237 to 456 pounds per day of NOx emissions, of which between 201 and 420 pounds would be caused by increased operation of the steam generating equipment. The higher estimates represented "worst-case" conditions in which the refinery would have to use boiler 4, the oldest boiler at the plant. In its final negative declaration (the Negative Declaration), however, the District concluded the Diesel Project "could not have a significant effect on the environment." While it noted the increased operation of existing steam generation equipment would cause additional NOx emissions, the District did not consider these increases to be part of the Diesel Project because they did not exceed the maximum rate of heat production allowed under existing permits.

Crucially, the District treated any additional NOx emissions stemming from increased plant operations within previously permitted levels as part of the baseline measurement for environmental review, rather than as part of the proposed Diesel Project. The District reasoned that ConocoPhillips had permits to operate the equipment, the refinery was an established use with operations fluctuating over time, and the proposed Diesel Project did not call for any equipment to exceed its permitted capacity. Applying this baseline in the Negative Declaration, not even the "worst-case" scenario produced significant NOx emission increases under CEQA. The District ultimately issued a notice of determination, approved the Diesel Project, and issued a permit to construct the modifications to the refinery.[3]

In their second amended petitions for writ of mandate, plaintiffs alleged the District had violated CEQA by failing to prepare an EIR before approving the Diesel Project. The trial court denied the petitions and entered judgment for the District and ConocoPhillips.

On appeal, plaintiffs argued substantial evidence supported a fair argument that the Diesel Project would have a significant environmental impact requiring the District to prepare an EIR. The Court of Appeal agreed, holding that increased use of existing equipment should have been evaluated as part of the Diesel Project, not as part of the baseline and, if the proper baseline had been used, the evidence of significant impact would be sufficient to require an EIR. In CEQA cases, the court explained, the proper baseline measurement should rest on " 'realized physical conditions on the ground' " instead of " 'merely

---

[3] The request of amicus curiae California Building Industry Association for judicial notice of materials related to the City of Los Angeles's Adaptive Reuse Program is denied on grounds of irrelevance.

hypothetical conditions.' " Rejecting other challenges to the Negative Declaration, the court reversed in part, affirmed in part, and remanded with directions the District be ordered to prepare an EIR.

We granted the District and ConocoPhillips's joint petition for review.

## DISCUSSION

As noted in the introduction, a public agency pursuing or approving a project need not prepare an EIR unless the project may result in a "significant effect on the environment" (§§ 21100, subd. (a), 21151, subd. (a)), defined as a "substantial, or potentially substantial, adverse change in the environment" (§ 21068). If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must (assuming the project is not exempt from CEQA) prepare an EIR. (Cal. Code Regs., tit. 14, § 15064, subd. (f)(1);[4] *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].) If the initial study instead indicates the project will have no significant environmental effects, the agency may, as the District did here, so state in a negative declaration. (Cal. Code Regs., tit. 14, § 15064, subd. (f)(3).)

An agency that, relying on a standard inconsistent with CEQA and the CEQA Guidelines, prepares only a negative declaration has not proceeded in the manner required by law and has thus abused its discretion, calling for a judicial remedy. (§ 21168.5; *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th at p. 426; *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 88.) In part I, *post,* we conclude the District's choice of a baseline for NOx emissions was inconsistent with CEQA and the CEQA Guidelines; the District should have looked to the existing physical conditions, rather than to the maximum permitted operation of the boilers.

If no EIR has been prepared for a nonexempt project, but substantial evidence in the record supports a fair argument that the project may result in significant adverse impacts, the proper remedy is to order preparation of an

---

[4] The regulations guiding application of CEQA, found in title 14 of the California Code of Regulations, section 15000 et seq., are often, and will sometimes be here, referred to as the CEQA Guidelines. "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 428, fn. 5 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

EIR. (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at pp. 75, 88; *Brentwood Assn. for No Drilling, Inc. v. City of Los Angeles* (1982) 134 Cal.App.3d 491, 504–505 [184 Cal.Rptr. 664].) In part II., *post,* we conclude that, using the correct baseline of physical conditions existing at the time environmental analysis was begun, a fair argument based on substantial evidence can be made that the Diesel Project will increase NOx emissions significantly. The appropriate remedy is therefore to order the District to set aside its Negative Declaration and project approval and to prepare an EIR that will evaluate, along with any other potentially significant impacts, these increased emissions. (See § 21168.9.)

I.  *Prior Operating Permits Do Not in Themselves Establish a Baseline for CEQA Review of a New Project*

In the Negative Declaration, the District acknowledged the Diesel Project would require increased use of the refinery's steam generation equipment, which it estimated would increase NOx emissions by between 201 and 420 pounds per day, depending on which boilers were used to generate the steam. Although this estimated increase exceeded the District's established significance threshold of 55 pounds per day, the District did not consider it a significant environmental effect of the project: "[T]he emissions associated with increased utilization of this existing equipment were considered baseline as opposed to proposed project because the Refinery holds valid permits to operate this equipment, and the equipment will continue to operate within their existing permit conditions and limits." In this court, the District and ConocoPhillips continue to espouse the view that the maximum operating levels allowed under ConocoPhillips's boiler permits was the correct baseline against which to compare the Diesel Project's NOx emissions, while plaintiffs maintain the District was required instead to use the actually existing levels of operation as a baseline and treat any increase over that baseline as a project impact.

Section 15125, subdivision (a) of the CEQA Guidelines provides: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. *This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.*" (Cal. Code Regs., tit. 14, § 15125, subd. (a), italics added.)[5] A

---

[5] Although this regulation refers specifically to the analysis in an EIR, the agency determination it addresses—"whether an impact is significant"—also arises at the initial study phase of CEQA review, when the agency must decide whether there are any significant environmental effects requiring assessment in an EIR. As all parties agree, the regulation is thus equally

long line of Court of Appeal decisions holds, in similar terms, that the impacts of a proposed project are ordinarily to be compared to the actual environmental conditions existing at the time of CEQA analysis, rather than to allowable conditions defined by a plan or regulatory framework. This line of authority includes cases where a plan or regulation allowed for greater development or more intense activity than had so far actually occurred,[6] as well as cases where actual development or activity had, by the time CEQA analysis was begun, already exceeded that allowed under the existing regulations.[7] In each of these decisions, the appellate court concluded the baseline for CEQA analysis must be the "existing physical conditions in the affected area" (*Environmental Planning & Information Council v. County of El Dorado, supra*, 131 Cal.App.3d at p. 354), that is, the " 'real conditions on the ground' " (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra*, 87 Cal.App.4th at p. 121; see *City of Carmel-by-the-Sea v. Board of Supervisors, supra*, 183 Cal.App.3d at p. 246), rather than the level of development or activity that *could* or *should* have been present according to a plan or regulation.

---

applicable at this phase. (See §§ 21060, 21068 [single definition of " '[s]ignificant effect on the environment' " applies throughout CEQA]; *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270, 1277–1278 [119 Cal.Rptr.2d 402].)

[6] *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 354, 357–358 [182 Cal.Rptr. 317] (effects of a proposed area plan for land development must be compared to the existing physical conditions in the area, rather than to development permitted under the county's general plan); *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 246–247 [227 Cal.Rptr. 899] (effects of rezoning must be compared to the existing physical environment, rather than to development allowed under a prior land use plan); *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 955 [91 Cal.Rptr.2d 66] (baseline for water diversion project was actually existing stream flows, not minimum stream flows set by federal license); *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 121 [104 Cal.Rptr.2d 326] (water use baseline for analysis of proposed land development was actual use without the project, not what the applicant was entitled to use for irrigation); *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 658 [57 Cal.Rptr.3d 663] (baseline for proposed expansion of a mining operation must be the "realized physical conditions on the ground, as opposed to merely hypothetical conditions allowable under existing plans"); *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 693, 706–710 [58 Cal.Rptr.3d 102] (effects of a large office and shopping center development must be compared to the current undeveloped condition of the property, rather than to an office park that could be developed under existing zoning).

[7] *Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1452–1453 [91 Cal.Rptr.2d 322] (baseline for a proposed quarry development was the actual condition of the land, even though some existing environmental degradation had resulted from prior illegal mining and clearing activities); *Fat v. County of Sacramento, supra*, 97 Cal.App.4th at pages 1278–1280 (baseline for airport expansion was existing airport operations, even though the airport had been operating and had expanded without a required permit for several years); *Eureka Citizens for Responsible Government v. City of Eureka* (2007) 147 Cal.App.4th 357, 370–371 [54 Cal.Rptr.3d 485] (baseline for proposed school playground use was the existing playground facility, even though prior construction of the facility may have violated the city's code).

Applied here, this general rule leads to the conclusion the District erred in using the boilers' maximum permitted operational levels as a baseline. By treating all operation of the boilers within the individual limits of their permits to be part of the environmental setting, or baseline, the District ensured that no emissions from increased boiler operation would be considered an environmental impact so long as no single boiler operated beyond its permitted capacity. Thus, the District's baseline operational level was the collective maximum capacity of the boilers; under the Negative Declaration's analysis, all four boilers could be run at maximum capacity simultaneously without creating any potential environmental impact. Yet the District acknowledged that in ordinary operation any given boiler ran at the maximum allowed capacity only when one or more of the other boilers was shut down for maintenance; operation of the boilers simultaneously at their collective maximum was not the norm.

■ Simultaneous maximum operation, then, is not a realistic description of the existing conditions without the Diesel Project. Indeed, the Negative Declaration does not attempt to justify its maximum permitted capacity baseline as reflecting the actually existing physical conditions without the Diesel Project. Rather, the Negative Declaration reasons that the increased steam production the Diesel Project called for was within the boiler permits' maximum operational levels and "could, therefore, occur even if the proposed project did not commence (exist)." By comparing the proposed project to what *could* happen, rather than to what was actually happening, the District set the baseline not according to "established levels of a particular use," but by "merely hypothetical conditions allowable" under the permits. (*San Joaquin Raptor Rescue Center v. County of Merced, supra,* 149 Cal.App.4th at p. 658.) Like an EIR, an initial study or negative declaration "must focus on impacts to the existing environment, not hypothetical situations." (*County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at p. 955.)

An approach using hypothetical allowable conditions as the baseline results in "illusory" comparisons that "can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts," a result at direct odds with CEQA's intent. (*Environmental Planning & Information Council v. County of El Dorado, supra,* 131 Cal.App.3d at p. 358.) The District's use of the prior permits' maximum operating levels as a baseline appears to have had that effect here, providing an illusory basis for a finding of no significant adverse effect despite an acknowledged increase in NOx emissions exceeding the District's published significance threshold.

The District and ConocoPhillips distinguish the cases cited above and argue for an exception from the "normal[]" rule of CEQA Guidelines section 15125, on the ground that here ConocoPhillips held an entitlement to operate the refinery boilers at the levels stated in the permits; in contrast, land use plans and zoning ordinances, considered in the cited cases, create no development entitlements in landowners. To employ an analytical baseline below the maximum levels stated in the boiler permits, they maintain, would defeat the company's vested rights and contravene CEQA's statute of limitations, section 21167. For reasons given below, we disagree.

### Vested Rights

■ The doctrine of vested rights as developed in land use law states that a property owner who, in good faith reliance on a government permit, has performed substantial work and incurred substantial liabilities has a vested right to complete construction under the permit and to use the premises as the permit allows. (*Russ Bldg. Partnership v. City and County of San Francisco* (1988) 44 Cal.3d 839, 845–846 [244 Cal.Rptr. 682, 750 P.2d 324].) Thus, "a permittee who has expended substantial sums under a permit cannot be deprived by a subsequent zoning ordinance of the right to complete construction and to use the premises as authorized by the permit." (*County of San Diego v. McClurken* (1951) 37 Cal.2d 683, 691 [234 P.2d 972].)[8]

We fail to see how using the boilers' actual preproject NOx emissions as a baseline for analyzing the Diesel Project's effects would impinge on any vested rights ConocoPhillips holds to operate the boilers at permitted levels. The project under review by the District here is ConocoPhillips's proposal to produce ultralow sulfur diesel fuel using a combination of existing, new, and modified refinery equipment. ConocoPhillips's right to operate the boilers at any particular level is not itself at issue. As demonstrated below, CEQA analysis of the Diesel Project, even if it used existing conditions as a baseline instead of the permit maximums, could not result in an order that ConocoPhillips reduce or limit its use of an individual boiler below the previously permitted level.

First, using existing conditions as a baseline for CEQA analysis, the District might conclude the Diesel Project's increased steam demands

---

[8] The doctrine is grounded in the constitutional prohibition against the taking of property without due process (*Russ Bldg. Partnership v. City and County of San Francisco, supra,* 44 Cal.3d at p. 846) and is related to the traditional protection for nonconforming uses established at the time zoning restrictions become effective, which in turn derives in part from the "doubtful constitutionality of compelling the immediate discontinuance of nonconforming uses" (*County of San Diego v. McClurken, supra,* 37 Cal.2d at p. 686).

would result in a significant increase in NOx emissions. As a measure in mitigation of this significant adverse effect, the District could condition its approval of the Diesel Project on compliance with a limit on NOx emissions from the boilers. (§§ 21002.1, subd. (b), 21081, subd. (a)(1); Cal. Code Regs., tit. 14, §§ 15040, 15126.4, subd. (a)(2).) Such a condition, however, would not deprive ConocoPhillips of any vested right; the boiler permits give ConocoPhillips no vested right to *pollute the air* at any particular level. (See *Sherwin-Williams Co. v. South Coast Air Quality Management Dist.* (2001) 86 Cal.App.4th 1258, 1273 [104 Cal.Rptr.2d 288] [plaintiffs' proprietary paint formulas did not give them "a property right to emit" air pollutants]; *Mobil Oil Corp. v. Superior Court* (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814] [oil companies' right "to continue releasing gasoline vapors into the atmosphere is neither fundamental nor vested"].) Indeed, both the District and ConocoPhillips acknowledge that irrespective of the Diesel Project the District may, in the course of its regulatory duties, require ConocoPhillips to modify its boilers to reduce their pollution, as it has in fact done in the past. Requiring pollution control mitigation as a condition of approving a new set of refinery operations does not amount to a prohibition on boiler operation in contravention of the preexisting permits and would not deprive ConocoPhillips of any vested right it holds under the boiler permits.

Alternatively, if a significant increase in NOx emissions from the Diesel Project were identified and the District found it could not feasibly be mitigated, the District might, for this reason, deny the new permits sought for the Diesel Project. (§ 21081; Cal. Code Regs., tit. 14, § 15042.) But this result, too, would not affect ConocoPhillips's right to continue operating the boilers for other refinery processes. ConocoPhillips does not, and could not, argue its boiler permits gave it a vested right to use the boilers *for the Diesel Project*—a new set of operations that was not in existence when the boiler permits were issued and for which ConocoPhillips seeks a new permit from the District. Disapproval of the Diesel Project because of increased NOx emissions (or for any other reason) would not in any way prevent ConocoPhillips from operating its boilers at levels allowed under the preexisting permits, as it did before the Diesel Project was initiated.[9]

■ Finally, beyond the fact CEQA review of the Diesel Project could not affect ConocoPhillips's right to continue operating the boilers, the District's and ConocoPhillips's contentions fail for a more fundamental reason. Even if

---

[9] A third possibility is that the District would find a significant increase in NOx emissions that could not feasibly be mitigated, but approve the Diesel Project anyway with a finding of overriding considerations. (§ 21081, subd. (b); Cal. Code Regs., tit. 14, § 15093.) Obviously, this would not impinge on any vested right ConocoPhillips holds.

environmental review were to indicate that the project's adverse effects could be mitigated only by a condition requiring ConocoPhillips to reduce or limit its use of an individual boiler below the previously permitted level, but ConocoPhillips's vested rights precluded imposition of that condition, CEQA would still demand an analysis of the project's true effects. That a particular mitigation measure may be infeasible or precluded, as by the applicant's vested rights, is not a justification for not performing environmental review; it does not excuse the agency from following the dictates of CEQA and realistically analyzing the project's effects. After proper analysis, the agency might decide to disapprove the project because of its immitigable adverse effects or to approve it with a finding of overriding considerations. (§ 21081, subd. (b).) In short, an applicant's vested rights might constitute a valid reason to forgo particular mitigation measures, but are not an excuse to avoid realistic CEQA analysis.

### Statute of Limitations

The District's and ConocoPhillips's claim that use of an existing conditions baseline would violate the statute of limitations fails for the same principal reason: CEQA analysis of the Diesel Project does not constitute review of the District's long-final decisions to issue the boiler permits. Section 21167 places relatively short time limits (between 30 and 180 days, depending on the type of challenge) on actions "to attack, review, set aside, void or annul" a public agency's "acts or decisions" for noncompliance with CEQA. But plaintiffs do not seek to review or set aside the District's approval of the boiler permits; they seek to review and set aside the District's approval of the Diesel Project, and as to that project no claim of untimeliness has been made. As explained earlier, moreover, the type of CEQA review for which plaintiffs argue—using existing physical conditions as the baseline to assess the Diesel Project's environmental impacts—could not result in an order revoking or revising the boiler permits. And even if section 21167's time limits would preclude employing such an order as mitigation, such preclusion would not excuse the District from performing the realistic assessment of environmental effects CEQA demands. The statute of limitations thus has no bearing here on the proper choice of analytical baseline.[10]

---

[10] For the same reasons, the District's argument that considering increased NOx emissions from the boilers as an impact of the Diesel Project would be applying CEQA retroactively to pre-CEQA projects (see § 21169) has no merit; the Diesel Project is not a pre-CEQA project, though it uses some equipment predating CEQA. Nor was the Diesel Project, first proposed in 2003, within the 1972 moratorium for ongoing projects (§ 21171), as ConocoPhillips argues. Nor, finally, was approval of the Diesel Project a nondiscretionary decision for the District (see § 21080, subd. (a)); even if the District lacked discretion to order any one boiler to be used below its permitted capacity, the District retained discretion to disapprove a new project on the ground it would increase air pollution from the boilers collectively.

*Court of Appeal Decisions*

The District and ConocoPhillips cite several Court of Appeal decisions as supporting the use of maximum operational levels allowed under a permit, rather than existing physical conditions, as a CEQA baseline. In each of these decisions, however, the appellate court characterized the project at issue as merely a modification of a previously analyzed project and hence requiring only limited CEQA review under section 21166 and CEQA Guidelines section 15162 (Cal. Code Regs., tit. 14, § 15162), or as merely the continued operation of an existing facility without significant expansion of use and hence exempt from CEQA review under CEQA Guidelines section 15301 (Cal. Code Regs., tit. 14, § 15301), or both.[11] The Diesel Project, in contrast, cannot be characterized as merely the modification of a previously analyzed project to operate refinery boilers or the continued operation of the boilers without significant expansion of use. Rather, the Diesel Project proposed adding a new refining process to the facility, requiring the installation of new equipment as well as the modification and significantly increased operation of other equipment. ConocoPhillips applied for a new permit for the Diesel Project, and the District treated it as a new project, finding not that it was exempt as the continued operation of an existing facility (Cal. Code Regs., tit. 14, § 15301) or subject to limited review as only a modification of a previously analyzed project (§ 21166; Cal. Code Regs., tit. 14, § 15162), but rather that, although a new project subject to CEQA review, it had no potential significant adverse effects requiring analysis in an EIR (Cal. Code Regs., tit. 14, § 15064, subd. (f)(3)).

■ None of the cited decisions, therefore, persuades us the preexisting boiler permits, by themselves, establish the proper baseline for CEQA analysis of the Diesel Project. We conclude the District's use of the maximum

___

[11] See *Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242–243 [82 Cal.Rptr.2d 436] (application for a permit to increase mine production treated as the continued operation of an existing facility and modification of the project authorized in a prior permit issued after CEQA analysis); *Temecula Band of Luiseño Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 437–438 [50 Cal.Rptr.2d 769] (modified pipeline design and route for water supply project that had already undergone CEQA review); *Bloom v. McGurk* (1994) 26 Cal.App.4th 1307, 1311–1312 [31 Cal.Rptr.2d 914] (renewal of a medical waste treatment facility's permit with no change in operations exempt as the continued operation of an existing facility); *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1477–1484 [277 Cal.Rptr. 481] (modified location of winery construction project on which CEQA review was already complete); *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 862–865 [237 Cal.Rptr. 723] (restoration of a sewage treatment plant's operation to the originally approved level was the continued operation of an existing facility and did not require supplemental CEQA analysis).

capacity levels set in prior boiler permits, rather than the actually existing levels of emissions from the boilers, as a baseline to analyze NOx emissions from the Diesel Project was inconsistent with CEQA and the CEQA Guidelines.[12] In the next part, we consider the District's and ConocoPhillips's arguments regarding the proper manner of measuring actually existing emissions.

II. *The Record Supports a Fair Argument the Diesel Project Will Have Significant Adverse Effects*

The Negative Declaration estimates the Diesel Project will result in increased NOx emissions of 201 to 420 additional pounds per day due to increased demand for steam from the boilers, and up to 456 pounds per day in total. As the District's established significance threshold for NOx is 55 pounds per day, these estimates constitute substantial evidence supporting a fair argument for a significant adverse impact.

The District and ConocoPhillips emphasize that refinery operations are highly complex and that these operations, including the steam generation system, vary greatly with the season, crude oil supplies, market conditions, and other factors. ConocoPhillips objects to the Court of Appeal's mandate that annual averages be used to arrive at a baseline of daily emissions, arguing this fails to account for day-to-day fluctuations and neglects to consider the significance of peak production periods.

We do not attempt here to answer any technical questions as to how existing refinery operations should be measured for baseline purposes in this case or how similar baseline conditions should be measured in future cases. CEQA Guidelines section 15125 (Cal. Code Regs., tit. 14, § 15125, subd. (a)) directs that the lead agency "normally" use a measure of physical conditions "at the time the notice of preparation [of an EIR] is published, or if no notice of preparation is published, at the time environmental analysis is commenced." But, as one appellate court observed, "the date for establishing baseline cannot be a rigid one. Environmental conditions may vary from year

---

[12] The Court of Appeal held the District had erred in relying on NOx emission levels set in a different permit, a refinery-wide permit issued under the District's RECLAIM (Regional Clean Air Incentives Market) pollution reduction program. In this court, however, neither the District nor ConocoPhillips relies on the RECLAIM permit to support the Negative Declaration's no-significant-impact conclusion, and the District insists the RECLAIM permit is "irrelevant" because the District's baseline determination "was *entirely unrelated* to the refinery's status as a RECLAIM facility." While the Court of Appeal's reading of the Negative Declaration was not without foundation—the District did at points appear to rely in part on the RECLAIM permit—we accept the District's concession that the RECLAIM permit is irrelevant to the baseline for NOx emissions from the existing boilers.

to year and in some cases it is necessary to consider conditions over a range of time periods." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra*, 87 Cal.App.4th at p. 125.) In some circumstances, peak impacts or recurring periods of resource scarcity may be as important environmentally as average conditions. Where environmental conditions are expected to change quickly during the period of environmental review for reasons other than the proposed project, project effects might reasonably be compared to predicted conditions at the expected date of approval, rather than to conditions at the time analysis is begun. (*Id.* at pp. 125–126.) A temporary lull or spike in operations that happens to occur at the time environmental review for a new project begins should not depress or elevate the baseline; overreliance on short-term activity averages might encourage companies to temporarily increase operations artificially, simply in order to establish a higher baseline.

Neither CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline. Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra*, 40 Cal.4th at p. 435.)

That refinery operations fluctuate over time, however, does not excuse the District from estimating the increase in NOx emissions, if any, the Diesel Project will create. Indeed, the District already made one such estimate in the Negative Declaration, finding the project would increase steam demand to a degree that would result in between 201 and 420 additional pounds per day of NOx emissions from the boilers. The Negative Declaration, though it does not explicitly employ an existing conditions baseline, implicitly uses a baseline—an unstated one—in estimating the increased rate at which the boilers will need to operate and the resulting increase in NOx emissions. The District is not necessarily required to use the same measurement method in the EIR as in the Negative Declaration. Whatever method the District uses, however, the comparison must be between existing physical conditions without the Diesel Project and the conditions expected to be produced by the project. Without such a comparison, the EIR will not inform decision makers and the public of the project's significant environmental impacts, as CEQA mandates. (§ 21100.)

## DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Baxter, J., Chin, J., Moreno, J., Pollak, J.,* and Premo, J.,†
concurred.

---

*Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.