Filed 9/10/15; pub. order 10/9/15 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| NORTH COUNTY ADVOCATES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF CARLSBAD, <br><br> Defendant and Respondent, <br><br> PLAZA CAMINO REAL, LP, et al., <br><br> Real Parties in Interest. | D066488 <br><br><br> (Super. Ct. No. 37-2013-00061990-CU-WM-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge. Affirmed in part, reversed in part with directions.

DeLano & DeLano, Everett L. DeLano III and M. Dare DeLano, for Plaintiff and Appellant.

Celia A. Brewer and Jane Mobaldi for Defendant and Respondent City of Carlsbad.

Alston & Bird, Edward J. Casey and Andrea S. Warren, for Real Parties in Interest.

Real Parties in Interest Plaza Camino Real, LP and CMF PCR, LLC (collectively, "Westfield") proposed to renovate a shopping center originally built in the City of Carlsbad (City) over 40 years ago.[1]  The City approved Westfield's request to renovate a former Robinsons-May store and other small portions of the shopping center (the project).  North County Advocates (Advocates) challenged the City's approval under the California Environmental Quality Act (CEQA; Pub. Resources Code,[2] § 21000 et seq.), arguing the project's environmental impact report (EIR) used an improper baseline in its traffic analysis because it treated the Robinsons-May store as fully occupied, even though it was vacated in 2006 and had been only periodically occupied since.  Advocates also argued the City violated CEQA by failing to consider as a mitigation measure that it require Westfield to make a fair share contribution to the future widening of the El Camino Real bridge over State Route 78 (the bridge) and by failing to respond adequately to public comments regarding traffic mitigation.  The trial court rejected Advocates's CEQA challenges and awarded the City costs for staff time spent reviewing and certifying the administrative record Advocates prepared.  Advocates appeals the trial court's CEQA and costs determinations.

We affirm the trial court's CEQA determinations.  Substantial evidence supports the City's determination of the traffic baseline because it was based on recent historical

---

[1]  We refer to Westfield and the City collectively as Respondents.

[2]  All further statutory references are to the Public Resources Code unless otherwise indicated.

use and was consistent with Westfield's right to fully occupy the Robinsons-May space without further discretionary approvals. Substantial evidence also shows the City's consideration of traffic mitigation measures and responses to comments were adequate. However, we conclude the trial court erred by awarding certain subcategories of costs to the City. Accordingly, we reverse the judgment as to three of the four subcategories, and remand for further proceedings in connection with one of them. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*The Original Project Site*

Westfield proposed to renovate a portion of a shopping center located in the City. Originally built in 1969, the project site was developed "as a two- and three-story indoor shopping center with five main anchor department store buildings (i.e., Sears, Macy's, Macy's Men, JC Penney, and the vacant former Robinsons-May) and numerous smaller retail specialty shops." The site contains over 6,400 surface parking spaces as well as several outbuildings within the main mall parking lots and across a street to the south of the main mall. While Westfield owns the developed parcels within the shopping center, the City owns the surface parking lots.

Under a "Precise Plan" the City first approved in 1977, Westfield was entitled to renovate the interior of the former Robinsons-May tenant building and fully occupy it without obtaining any further discretionary approvals from the City.

3

*The Specific Plan and Site Development Plan for the Project*

The City approved two entitlements for the project: (1) a "Specific Plan" to facilitate future development at the shopping center area beyond the project; and (2) a "Site Development Plan," which allowed for the immediate project. The Specific Plan area included all of the shopping center buildings and the majority of the shopping center's surface parking areas.

The Site Development Plan allowed for the immediate removal, renovation, and/or redevelopment of portions of the east end of the existing mall structure and associated outbuildings. As described in the "Draft EIR," the Site Development Plan would have allowed for a net increase of approximately 35,000 square feet of gross leasable area. The project initially proposed to build additional retail space west of the Robinsons-May building on three pads built as outparcels within the City-owned surface parking lots to accommodate future restaurant and/or retail space.

*The Final Approved Project*

Because Westfield and the City were unable to agree on lease terms for development of the City-owned outparcels, Westfield reduced the scope of the project as described in the Draft EIR and revised the Site Development Plan. The reduced project still included demolition and reconstruction of the former Robinsons-May store. As revised, the project would result in a net loss of 636 square feet of total gross leasable area in the shopping center.

The project was under construction at the time of the June 2014 hearing on Advocates's petition for writ of mandate and was completed before the 2014 holiday season.

*The City's Environmental Review and Project Approvals*

The City released the Draft EIR on August 31, 2012, with nine technical reports and studies attached as appendices. Those technical studies included a 194-page (excluding supporting appendices) "Transportation Study." The Draft EIR evaluated three alternatives to the project. With implementation of a number of mitigation measures, the Draft EIR concluded the project would not cause any significant environmental impacts.

The City received 10 comment letters on the Draft EIR. The City responded to all of them, and included its responses in the December 2012 final EIR. The City also issued a 37-page "Mitigation Monitoring and Reporting Program" with the final EIR.

On June 5, 2013, the City's planning commission conducted a public hearing and approved the Site Development Plan and recommended approval to the city council of the Specific Plan for the project.

On July 9, 2013, the city council conducted its public hearing on the project. Two members of the public—including Advocates's counsel—expressed concern about the project; three others expressed support. The city council unanimously approved the project, adopted the Specific Plan, approved the Site Development Plan, and certified the final EIR. On July 10, 2013, the City filed a "Notice of Determination" under CEQA.

5

*Advocates's Petition for Writ of Mandate*

On August 7, 2013, Advocates filed a petition for writ of mandate challenging the City's approvals of the project. As relevant here, the petition challenged the City's determination of the baseline for traffic trips, the EIR's mitigation measures for traffic impacts, and the City's response to comment letters concerning those mitigation measures.

The trial court heard the petition on June 6, 2014; issued an order denying the petition on June 24; and entered a final judgment on July 2.

*The Costs Award*

Westfield filed a memorandum of costs in the amount of $5,490.24, and the City filed one seeking $6,237. Advocates filed motions to tax costs targeting each. The trial court denied Advocates's motions and awarded costs to Westfield and the City according to their memoranda of costs.

*Advocates's Appeal*

Advocates timely appealed the judgment upholding the project approvals and awarding the City its costs. Advocates does not challenge the award of costs to Westfield.

DISCUSSION

Advocates contends the trial court erred by rejecting Advocates's challenges to the City's (1) use of an incorrect and misleading baseline in the EIR's traffic analysis, (2) failure to adequately analyze traffic impacts, and (3) failure to adequately respond to comments it received regarding the EIR. Advocates also contends the trial court erred by

6

awarding the City costs for time its staff spent reviewing and certifying the administrative record that Advocates prepared.

## I. GENERAL CEQA PRINCIPLES AND STANDARD OF REVIEW

"CEQA embodies our state's policy that 'the long-term protection of the environment . . . shall be the guiding criterion in public decisions.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1100; § 21001, subd. (d).) The EIR is the " 'heart of CEQA.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392.) Its "function is to ensure that government officials who decide to build or approve a project do so with a full understanding of the environmental consequences and, equally important, that the public is assured those consequences have been taken into account." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 449 (*Vineyard Area Citizens*).) "The EIR process protects not only the environment but also informed self-government." (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

An EIR is presumed adequate; the challenger in a CEQA action bears the burden of proving otherwise. (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275 (*Preserve Wild Santee*).) "In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 426, fn. omitted.) " 'Judicial review of these two types of

7

error differs significantly:  While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions.' "  (*Preserve Wild Santee, supra*, 210 Cal.App.4th at p. 275.)  "An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision . . . ."  (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 427.)

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE CITY'S TRAFFIC BASELINE DETERMINATION

"To decide whether a given project's environmental effects are likely to be significant, the agency must use some measure of the environment's state absent the project, a measure sometimes referred to as the 'baseline' for environmental analysis."  (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 315 (*Communities for a Better Environment*).)  Under the Guidelines for Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) (Guidelines),[3] "the baseline 'normally' consists of 'the physical environmental conditions in the vicinity of the project, as they exist at the time . . . environmental analysis is

---

[3]    The Guidelines are regulations "prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of" CEQA. (Guidelines, § 15000; § 21083.)  "In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous."  (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 428, fn. 5.)

8

commenced . . . .' " (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 315, citing Guidelines, § 15125, subd. (a).)[4]

Advocates contends the EIR's traffic baseline is "incorrect and misleading" because it did not follow the " 'normally' " applicable rule of measuring conditions as they actually existed when environmental review began. (Capitalization and bold typeface omitted.) Advocates contends the City instead "falsely inflated the existing traffic conditions" by "imputing over 5,000 daily trips" to the baseline premised on a fully occupied Robinsons-May building when, in fact, Robinsons-May vacated the space in 2006. Advocates contends that by falsely inflating the existing traffic conditions, the baseline understates the project's true impact on the environment. We review for substantial evidence an agency's decision to deviate from the normal rule for determining a baseline. (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 457 (*Smart Rail*) ["If substantial evidence supports an agency's determination that an existing conditions impacts analysis would provide little or no relevant information or would be misleading as to the project's true impacts, a reviewing court may not substitute its own judgment on this point for that of the agency."].)

---

4     Guidelines section 15125, subdivision (a) states: "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives."

The EIR provides the following explanation of how and why the City deviated from the normal rule in selecting the baseline:

> "Westfield Carlsbad currently has vacant leasable space beyond the regular amount expected in super regional shopping centers, mainly the 148,159-square foot Robinson's-May building. Since this space is currently vacant, traffic from this space is not included in the traffic counts conducted at the analyzed intersections and street segments. However, for purposes of determining the Existing Baseline conditions pursuant to CEQA Guidelines Section 15125, trips attributable to that currently unoccupied space were added to the baseline conditions counted in the project area as noted below.
>
> "Trip generation rates and estimates for the vacant Robinson's-May building were estimated using those identified in the San Diego Association of Government's (SANDAG's) *Brief Guide of Vehicular Traffic Generation Rates for the San Diego Region* (SANDAG 2002) for a 'Super Regional Shopping Center' land use. These estimates are conservative in that they do not account for trip reductions from pass-by trips. Based on the rate, the vacant Robinson's-May building could generate a total of 5,186 daily trips on a typical weekday . . . . These modified traffic volumes were added to the existing traffic counts collected in the project area and represent the Existing Baseline conditions for the purposes of this study. [The Transportation Study attached as] Appendix F provides a detailed description of the methodology used to establish the Existing Baseline condition."

The Transportation Study elaborates on the City's determination of the traffic baseline:

> "Existing Baseline Conditions – Westfield Plaza Camino Real is an existing super regional shopping [center] which is entitled for 1,151,092 [square feet] of retail commercial space. All of the currently entitled square footage is completely constructed. However, the nature of a shopping center is that tenants change and the amount of occupied space constantly fluctuates.
>
> "Plaza Camino Real currently has unoccupied leasable space beyond the normal amount, mainly the 148,159 [square foot] Robinsons-May building. Since this space is currently vacant, traffic from this

space is not included in the actual traffic counts conducted at the analyzed intersections and street segments. However, for the purposes of determining the Existing Baseline Conditions pursuant to California Environmental Quality Act (CEQA) Guidelines Section 15125, trips attributable to that currently unoccupied space are imputed. A full occupancy assumption is consistent with SANDAG's regional traffic modeling methodology which assumes full occupancy of all entitled square footage. It is also consistent with the City of Carlsbad and City of Oceanside's determination of existing baseline because the currently vacant space could be occupied at anytime without discretionary action. In fact, portions of that space are periodically occupied with temporary uses such as a Halloween store which leases the space in the month of October. For these reasons, full occupancy of all entitled square footage is assumed in determining the Existing Baseline Conditions."

Using the baseline with the imputed Robinsons-May traffic, the Transportation Study concludes the "Project will not result in a significant impact at any of the analyzed intersections during either peak hour, or any of the analyzed street segments during either peak hour or daily conditions."

Advocates contends the California Supreme Court rejected the practice of imputing use levels in *Communities for a Better Environment, supra*, 48 Cal.4th 310. Respondents counter that *Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316 (*Cherry Valley*), a case decided by Division Two of this Court, permits an agency to base an existing-conditions baseline on recent historical use levels if those levels are permitted to continue. (*Id.* at p. 337.) We conclude Respondents have the better argument—*Communities for a Better Environment* is distinguishable and *Cherry Valley* is on point and persuasive.

In *Communities for a Better Environment*, the Supreme Court reversed a regional air quality management district's approval of ConocoPhillips's application to modify a

11

petroleum refinery in a way that would increase operation of four boilers that produced steam for refinery operations, but also emitted nitrogen oxide (a major contributor to smog). (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 317.) The district selected as the project's baseline for nitrogen oxide emissions the amount the boilers would emit if they operated at the maximum level allowed under ConocoPhillips's existing permits, even though ConocoPhillips had never operated them at that level. (*Id.* at pp. 318, 322.) Using this baseline, the district concluded the project would not have a significant impact on the environment, even though it was undisputed that the as-modified refinery's emissions would exceed the district's "significance threshold." (*Id.* at pp. 317-318.) The Supreme Court concluded this was error.

The Supreme Court approved a line of Court of Appeal decisions that "concluded the baseline for CEQA analysis must be the 'existing physical conditions in the affected area' [citation], that is, the 'real conditions on the ground' [citations], rather than the level of development or activity that *could* or *should* have been present according to a plan or regulation." (*Communities for a Better Environment, supra*, 48 Cal.4th at p. 321.) Applying this general rule, the court concluded the district's selected baseline was impermissibly "hypothetical" because it was based on maximum permitted operating conditions that were "not the norm." (*Id.* at p. 322.)

But while the Supreme Court recognized public agencies should " 'normally' " use "existing conditions" as the baseline (*Communities for a Better Environment, supra*, 48 Cal.4th at pp. 327-328), the court also recognized that "[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule" (*id.* at p. 328). Citing as an example

ConocoPhillips's concern that refinery operations "vary greatly with the season, crude oil supplies, market conditions, and other factors" (*id.* at p. 327), the court explained that agencies may exercise discretion to accommodate a "temporary lull or spike in operations that happens to occur at the time of environmental review" (*id.* at p. 328; *Save Our Peninsula Committee v. Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99, 125 ["Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods."]). As long as that exercise of discretion is supported by substantial evidence, the courts will not disturb it. (*Communities for a Better Environment, supra*, at p. 328.)

Applying *Communities for a Better Environment*, the *Cherry Valley* court upheld a city's "quintessentially . . . discretionary" baseline determination of a project site's water use levels where the site's historical water use fluctuated. (*Cherry Valley, supra*, 190 Cal.App.4th at p. 337.) Sunny-Cal operated an egg farm on the site from the 1960's through 2005, when the site transitioned to cattle ranching and feed crop operations. (*Id.* at pp. 324, 329.) The record showed the egg farm used an average of 1,340 acre-feet annually of groundwater between 1997 and 2001, but the cattle ranch used only 50 acre-feet annually beginning in 2005.[5] (*Id.* at pp. 329.) In a 2006 revised draft EIR, the city selected as the groundwater use baseline 1,484 acre-feet annually, which was the amount the developer was entitled to extract under a 2004 water-rights adjudication. (*Id.* at pp. 325, 331.) The petitioners contended the baseline should have been the then-existing 50

___

5    The opinion is silent regarding the site's water use between 2001 and 2005. (*Cherry Valley, supra*, 190 Cal.App.4th at pp. 329-335.)

acre-feet annually level. (*Id.* at p. 336.) The Court of Appeal upheld the city's determination.

The court distinguished *Communities for a Better Environment* and other cases cited by the petitioner on the ground that the baseline in each of those cases was hypothetical because it was based on "conditions that were *permissible* pursuant to an existing plan or regulation but that were not being employed or that did not exist 'on the ground' at the time environmental review commenced." (*Cherry Valley, supra*, 190 Cal.App.4th at p. 338, italics added; *id.* at pp. 339-340, citing *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 693, 697 [baseline for 477,000 square-foot office park to be built on vacant lot was apparently based on 694,000 square-foot maximum allowed under applicable zoning] and *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 357-358 [EIR's for two general plan amendments were deficient because they compared the impacts of the amendments with the existing general plan, which projected populations far larger than ever actually materialized].) By contrast, the *Cherry Valley* court concluded substantial evidence showed the baseline was not hypothetical because it was based not only on Sunny-Cal's *entitlement to extract* 1,484 acre-feet annually of groundwater, but also on Sunny-Cal's recent history of *actually extracting* substantially the same amount. (*Cherry Valley, supra*, 190 Cal.App.4th at p. 340.)[6]

_____

6    The Supreme Court recently cited this aspect of *Cherry Valley* with approval. (See *Smart Rail, supra*, 57 Cal.4th at p. 450 [*Cherry Valley* "applied *Communities for a*

Like *Cherry Valley* and unlike *Communities for a Better Environment*, the City's selection of a traffic baseline that assumed full occupancy of the Robinsons-May space was not merely hypothetical because it was not based *solely* on Westfield's entitlement to reoccupy the Robinsons-May building "at anytime without discretionary action," but was also based on the actual historical operation of the space at full occupancy for more than 30 years up until 2006. And like the period when Sunny-Cal used less water on its land for cattle ranching and feed crops, the Robinsons-May space was less occupied from 2007 through 2009 (two retail users occupied part of it from August 2006 through December 2007, and two others occupied part of it from August through November in 2008 and in 2009).[7] We view this fluctuating occupancy—which is "the nature of a shopping center"—as akin to the varying oil refinery operations in *Communities for a Better Environment* that led the Supreme Court to recognize that agencies have discretion

---

*Better Environment*" to demonstrate that "recent historical use [can] constitute[] a realistic measure of existing conditions."].)

[7] Advocates attempts to distinguish this similarity by arguing that environmental review in *Cherry Valley* began in 2004 when Sunny-Cal was still using the project site as an egg farm and extracting 1,340 acre-feet annually of groundwater, whereas environmental review did not begin here until 2009, when the Robinsons-May space had already been vacant for approximately three years. This argument fails. First, the *Cherry Valley* court did not state (as Advocates asserts) that Sunny-Cal "had *actually used* that much groundwater 'since February 2004 . . . .' " (Italics added.) Instead, the court was referring to the fact that "Sunny-Cal's 1,484 [acre-feet annually] *entitlement* to Beaumont Basin groundwater" existed since 2004. (*Cherry Valley, supra*, 190 Cal.App.4th at pp. 338-339, italics added.) Similarly, Westfield's right to fully reoccupy the Robinsons-May space "at anytime without discretionary action" existed since 1977. Second, even though Sunny-Cal was using the project site as an egg farm when environmental review began in 2004, the only evidence of Sunny Cal's actual egg-farm-related water use level discussed in the opinion was from 1997 through 2001—a period that ended, as here, three years before environmental review began. (*Id.* at pp. 329-335.)

15

" 'to consider conditions over a range of time periods' " to account for a "temporary lull or spike in operations . . . ." (*Communities for a Better Environment, supra*, 48 Cal.4th at pp. 327-328.)

The City's decision to base the traffic baseline on historical occupancy rates is further supported by substantial evidence consisting of SANDAG data on such use levels.

Therefore, we conclude substantial evidence supports the City's exercise of discretion in selecting a traffic baseline that assumed a fully occupied Robinsons-May building.

### III. SUBSTANTIAL EVIDENCE SUPPORTS THE SELECTED TRAFFIC MITIGATION MEASURE

Advocates contends the City violated CEQA by failing to adequately analyze traffic impacts. The final EIR discloses the project would have no direct impact on traffic, but would have indirect cumulative impacts on three street segments in the neighboring City of Oceanside (Oceanside). The City's transportation consultant opined the project's indirect impacts could be mitigated to less-than-significant levels by requiring Westfield to contribute its fair share—approximately $6,000—toward "adaptive-response signals" that adjust to address real-time traffic conditions. The City adopted this mitigation measure. Advocates contends the City should also have considered the mitigation measure suggested by Oceanside: that Westfield be required to contribute its fair share—approximately $85,000—toward widening of the bridge. Respondents contend the City was not required to consider this alternative because the project had no significant impact on the bridge and the adaptive-response signals

16

otherwise adequately mitigated the project's impacts. Under these circumstances, substantial evidence supports the City's consideration and selection of traffic mitigation measures.

"[I]t is the policy of the state that public agencies should not approve projects as proposed if there are . . . feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.) An EIR must identify and analyze the significant environmental effects that may result from the project. (§ 21100, subds. (a), (b); Guidelines, §§ 15126.2, subd. (a), 15143.) For each significant effect, the EIR must describe and discuss feasible mitigation measures that could minimize the effect. (§ 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a); *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1162 ["The EIR is the heart of CEQA, and the mitigation and alternatives discussion forms the core of the EIR."].) We review "a factual dispute over 'whether adverse effects have been mitigated or could be better mitigated' . . . for substantial evidence." (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 435.)

Substantial evidence supports the City's consideration and selection of traffic mitigation measures. Before the City released the Draft EIR, it commissioned traffic experts to evaluate the project's potential impacts on traffic in the City and in Oceanside. The City provided Oceanside with an opportunity to comment on the consultant's draft transportation study. Oceanside responded in December 2009 with an eight-page letter containing 57 comments on the draft. Comment 56 states, "The project will be required to contribute a fair share contribution toward the Traffic Management Center (TMC for

17

adaptive signals on El Camino Real) and toward the future widening of the bridge at El Camino Real at SR78."

The City's traffic consultant conferred with the City and Oceanside to select 18 intersections and street segments (10 of each in Carlsbad and eight of each in Oceanside) at which to study the project's potential traffic impacts. The bridge was one of the studied street segments. The consultant analyzed impacts to the intersections and segments using the guidelines set forth by both cities. The consultant's Transportation Study concluded "the project is not expected to result in a direct significant impact at any of the analyzed intersections or street segments" and, therefore, "[n]o mitigation for direct project impacts is required." However, the Transportation Study also concluded that "*indirect* cumulative impacts" to three street segments in Oceanside would be considered significant under Oceanside's standards. (Italics added.) The bridge was not one of the three impacted street segments. The study recommended mitigating the indirect impacts by requiring Westfield to contribute its "fair[ ]share" toward adaptive-response signals along the three affected segments.

The City's Draft EIR attached the Transportation Study, devoted a 55-page chapter to a discussion of the project's traffic impacts, and adopted the study's recommended adaptive-response-signal mitigation measure. The Draft EIR concluded this mitigation measure would mitigate the project's indirect cumulative impacts on traffic to "less than significant levels." In October 2012, Oceanside sent the City a one-page letter commenting on the Draft EIR. The letter, which enclosed for reference Oceanside's previous 57-item letter, makes only the following single comment on the Draft EIR:

18

"The City of Oceanside does not support the current recommendation specified in the [Draft EIR] for the project to contribute a fair share toward future adaptive signals on El Camino Real. The project must contribute its fair share toward the future widening of the El Camino Real Bridge over SR78. The recommended mitigation measure in the Final EIR must be changed to reflect the appropriate fair share based on the project's proportion to the growth of future traffic volumes along the bridge."

The "Comments and Responses" section of the final EIR contains the following response by the City to Oceanside's October 2012 letter:

"Comment noted. The City of Carlsbad recognizes the City of Oceanside's prior consultation with Carlsbad's traffic consultant concerning the potential traffic impacts of the proposed project. The Draft EIR traffic analysis demonstrates that the proposed project would not cause a significant direct impact to any segments of El Camino Real, including the segment containing the bridge over SR-78. Therefore, there is no requirement in the Draft EIR for the applicant to contribute a fair share payment toward the future widening of the El Camino Real Bridge over SR-78. The applicable comments from the December 2009 letter attached to this comment were integrated into the Transportation Study that was circulated with the Draft EIR."

The final EIR did not change substantively with respect to traffic mitigation. It conditioned the project's approval on Westfield providing proof that it contributed its fair share toward the adaptive-response signals for the three street segments affected by the project.

Advocates's challenge to the City's consideration of traffic impacts is narrow. Advocates does not (1) contend the City's traffic consultant selected the wrong intersections or street segments to study; (2) challenge the Transportation Study's finding that the project will not lead to any direct significant impacts to any intersections or street segments, or that the project will lead to indirect cumulative impacts on only the three

19

identified street segments; (3) dispute the final EIR's conclusion that the project will not lead to any significant impacts to the bridge; or (4) challenge the final EIR's conclusion that requiring Westfield to contribute its fair share toward adaptive-response signals will mitigate the indirect cumulative impacts to the three relevant street segments to less-than-significant levels. Instead, Advocates's only challenge is to the City's selection of the adaptive-response-signal mitigation measure instead of the measure that would have required Westfield to contribute its fair share toward future expansion of the bridge. In light of the substantial evidence supporting the City's uncontested findings, Advocates's challenge fails.

Advocates's primary legal argument is that the final "EIR fails as an informational document," citing *Lotus v. Dept. of Transportation* (2014) 223 Cal.App.4th 645, 653 (*Lotus*) for the proposition that "where several potential mitigation measures are available, each should be discussed separately, and the reasons for choosing one over the others should be stated." (*Ibid*., quoting *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027 (*SOCA*).) Neither *Lotus* nor *SOCA* are analogous. In *Lotus*, the appellate court addressed the failure of an EIR for a freeway-widening project through a redwood forest to "identify any standard of significance" against which to measure the project's impact on redwood trees. (*Lotus, supra*, 223 Cal.App.4th at pp. 647, 655.) The court addressed mitigation measures only to the extent the EIR improperly incorporated them—masked as " 'special construction techniques' " (*id.* at p. 651)—into "its description of the project and then conclud[ed] that any potential impacts

20

from the project will be less than significant." (*Id.* at pp. 655-656.) *Lotus* contains no discussion of competing mitigation measures.

The petitioner in *SOCA* challenged an EIR for a downtown redevelopment project because the "EIR provides no specific mitigation measures for the parking impacts, but instead offers a list of 'seven general measures of the sort that *might* be included in [the City's] *unformulated* "Transportation Management Plan." ' " (*SOCA, supra*, 229 Cal.App.3d at p. 1026.) In other words, the petitioner attacked the EIR for failing to actually adopt any mitigation measure. That is not the case here.

As discussed above, the final EIR extensively discussed the project's impacts on traffic and incorporated the Transportation Study's recommended mitigation measure of requiring Westfield to contribute its fair share toward adaptive-response signals on the three affected street segments. Because it is undisputed that this measure will mitigate the indirect cumulative impacts to the three relevant street segments to less-than-significant levels and that the project will have no direct or indirect significant impacts on the bridge, substantial evidence supports the City's selection of this mitigation measure.

IV.    THE CITY ADEQUATELY RESPONDED TO COMMENTS

ON THE DRAFT EIR

Advocates contends the City failed to respond adequately to comments it received on the Draft EIR from Advocates, the California Department of Transportation (Caltrans) and Oceanside. Largely for reasons we have already discussed, we disagree.

"After issuance of a draft EIR, '[t]he lead agency shall evaluate comments on environmental issues received from persons who reviewed the draft EIR and shall prepare

21

a written response.' " (*Paulek v. Department of Water Resources* (2014) 231 Cal.App.4th 35, 48, quoting Guidelines, § 15088, subd. (a).) "Responses to comments need not be exhaustive; they need only demonstrate a 'good faith, reasoned analysis.' " (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 937; Guidelines, § 15088, subd. (c).) " ' "[T]he determination of the sufficiency of the agency's responses to comments on the draft EIR turns upon the detail required in the responses. [Citation.] Where a general comment is made, a general response is sufficient." ' " (*Gilroy Citizens, supra*, 140 Cal.App.4th at p. 937.) "Satisfactory responses to comments ' "may be provided by reference to the EIR itself." ' " (*Ibid.*)

Through its counsel, Advocates raised 16 questions regarding the Draft EIR. On appeal, Advocates challenges only the sufficiency of the City's response to the comment that "the EIR adopts an incorrect baseline for much of its discussion, reasoning that the 'existing' environment includes occupancy of the vacant Robinsons-May store." The City's response cited *Communities for a Better Environment, supra*, 48 Cal.4th at pp. 327-328 for the need "to consider conditions over a range of time periods" based on conditions that " 'vary from year to year,' " discussed the historical occupancy of the Robinsons-May space, noted Westfield's vested right to fully occupy the space, and concluded that "given that the current vacancy of the Robinson's-May space is part of a temporary vacancy, the Draft EIR appropriately presumes an occupied store is part of the environmental baseline condition for the purposes of the EIR's analysis of the proposed project." The City's response adequately—and, as discussed in section II, *ante*, accurately—addressed Advocates's comment regarding the traffic baseline.

Advocates contends the City's response to Caltrans's comments regarding baseline conditions mischaracterized the City's baseline analysis. Caltrans's comment stated, "Volumes used for Existing Baseline Conditions appear too low," then compared data in the Transportation Study with historical Caltrans study data. The City responded:

> "The traffic counts used in the traffic analysis and reported in the Draft EIR represent the physical environment at the study intersections as it existed at the time the Notice of Preparation (NOP) was issued for the Draft EIR, consistent with Section 12125 of the CEQA Guidelines. Specifically, the traffic analysis evaluated potential project impacts on the existing environment based on the traffic count data collected at the identified study locations in September 2009 and March 2010. With the recent economic downturn, traffic volumes on many of the main commercial corridors in Southern California have decreased below 2006-2008 levels, which may explain the lower volumes cited in the comment from other studies by Caltrans and Rick Engineering. No modifications to the Transportation Study are warranted since the data were collected consistent with the CEQA Guidelines."

Advocates contends this response was "incorrect, or at least misleading," because although the response claimed the study data was based on actual existing conditions, the City's baseline added trips attributable to a fully occupied Robinsons-May building. Advocates misreads Caltrans's comment—it was focused on apparent discrepancies in the actual study data, not imputation of trips to a temporarily vacant store. Accordingly, the City's response to Caltrans was adequate and was not misleading.

Finally, Advocates contends the "City summarily dismissed Oceanside's concerns about traffic mitigation." On the contrary, the City's response to Oceanside's October 2012 comment (both of which are quoted in full in section III, *ante*) is more comprehensive than the comment itself. (*Gilroy Citizens, supra*, 140 Cal.App.4th at p.

23

937 [" ' "Where a general comment is made, a general response is sufficient." ' "].)

Advocates's remaining contention—that "the City failed entirely to respond specifically to any of the other comments provided by Oceanside"—is misleading because it confuses Oceanside's December 2009 preliminary comments on the Transportation Study with Oceanside's October 2012 comments on the Draft EIR, the latter of which raised only the single issue regarding bridge-widening, but reattached the former for reference. Therefore, we conclude the City's response to Oceanside's comment on the Draft EIR was adequate.

## V.    THE TRIAL COURT ERRED BY AWARDING THE CITY
## ALL OF ITS REQUESTED COSTS

In litigation challenging a CEQA determination, the petitioner may either request that "the respondent public agency prepare the record of proceedings relating to the subject of the action or proceeding" *at the petitioner's expense*, or the petitioner may prepare the record itself and then have the public agency certify it for accuracy. (§ 21167.6, subds. (a), (b)(2).)  If the petitioner elects to prepare the record, the public agency cannot recover its costs incurred in reviewing the record for accuracy—"[t]his sort of review is a chore public agencies face in every case in which the petitioner elects to prepare the record . . . ."  (*Coalition for Adequate Review v. City and County of San Francisco* (2014) 229 Cal.App.4th 1043, 1059 (*Coalition for Adequate Review*).)  But if a petitioner-prepared record is incomplete, "and an agency is put to the task of supplementation to ensure completeness," then the agency may recoup the costs it incurred in preparing the supplemental record."  (*Id.* at pp. 1055-1056.)

24

Advocates contends that because it elected to prepare the administrative record, the trial court erred by awarding the City "$5,802 for [s]taff time to review, correct and certify' " it. The City counters that the trial court properly awarded the costs because the City's work on the administrative record "went far beyond simply reviewing the record for completeness." Although the City's cost memorandum provides no description of its work beyond "[s]taff time to review, correct and certify the administrative record," the City's submission in opposition to Advocates's motion to tax costs identifies four subcategories of work: (1) "[r]eviewing and correcting the draft record"; (2) locating attachments that were " 'missing' " from the documents the City originally made available to Advocates; (3) obtaining additional files from the City's consultant; and (4) responding to Advocates's motion to augment the record with the "missing attachments."

"Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court. [Citations.] Discretion is abused only when, in its exercise, the court 'exceeds the bounds of reason, all of the circumstances being considered.' [Citation.] The appellant has the burden of establishing an abuse of discretion." (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 181.) We conclude the trial court erred with respect to all but one of the City's subcategories of costs.

We begin by discussing two cases in which appellate courts addressed costs awarded to agencies in connection with petitioner-prepared administrative records. In *Coalition for Adequate Review, supra*, 229 Cal.App.4th 1043, the city approved the petitioner-prepared administrative record, "but only in part, stating it was incomplete."

25

(*Id.* at p. 1048.) The city had made nearly 30,000 pages of documents available, yet the petitioner presented for certification a 30-volume record totaling only approximately 8,300 pages. (*Ibid.*) The city tried to convince the petitioner to add approximately 4,800 pages of documents the city contended were statutorily required to be included in the administrative record, but the petitioner declined. (*Ibid.*) The city then filed a motion for leave to augment the record, which the trial court granted (with the exception of approximately 250 duplicative pages). (*Id.* at pp. 1048-1049.) After it prevailed on the merits of the petition, the city filed a memorandum of costs seeking over $64,000 for " 'administrative record, professional messenger, and services.' " (*Id.* at p. 1050.) The trial court granted the petitioner's motion to tax those costs, but the Court of Appeal reversed. (*Id*. at pp. 1050, 1062.)

The *Coalition for Adequate Review* court observed that "the fact a petitioner elects to prepare the record . . . does not *ipso facto* bar the recovery of record preparation costs by a public agency." (*Coalition for Adequate Review, supra*, 229 Cal.App.4th at p. 1055.) For while "[t]here is no question the alternative record preparation procedures . . . are intended to reduce record preparation costs," a petitioner-prepared record must still be complete. (*Ibid*.) Therefore, the court held: "When a record prepared [by a petitioner] under [section 21167.6,] subdivision (b)(2) is incomplete, and an agency is put to the task of supplementation to ensure completeness, the language of the statute allows, and the purpose of the record-preparation cost provision to protect public monies counsels, that the agency recoup the costs of preparing the supplemental record." (*Id.* at pp. 1055-1056.) On the record before it, the court had "no trouble concluding the City was

26

effectively put to the task of preparing a statutorily complete record and, therefore, may recover its reasonable costs of preparing the supplemental record." (*Id.* at p. 1057.)

But the record also revealed a problem: the city's request for approximately $50,000 for over 300 hours of paralegal time did not distinguish between costs related to preparing a supplemental record—which are recoverable—and those related to reviewing the record for accuracy or completeness—which are not. (*Coalition for Adequate Review, supra*, 229 Cal.App.4th at p. 1059.) The court observed that reviewing for accuracy "is a chore public agencies face in every case in which the petitioner elects to prepare the record under section 21167.6, subdivision (b)(2), and if an agency could always claim a sizeable amount for review 'for completeness' or 'certification,' that would defeat the Legislature's aim of providing for lower-cost record preparation alternatives." (*Ibid.*) The court also warned that "record review 'for completeness' can easily blur into review for strategy, implicating the kind of attorney fee award neither authorized nor sought here." (*Ibid.*) The court concluded: "Because the trial court denied record preparation costs entirely, it did not review the City's claimed paralegal costs to determine which of these costs were for work reasonably required to prepare the supplemental record (e.g., locating, copying, indexing, and assembling documents) and are recoverable, and which were for review of the record petitioners prepared 'for completeness' and are not recoverable. On remand, the trial court will need to make this determination." (*Id.* at pp. 1059-1060.)

In *St. Vincent's School for Boys, Catholic Charities CYO v. City of San Rafael* (2008) 161 Cal.App.4th 989 (*St. Vincent's School*), the petitioner elected to prepare the

administrative record in connection with its CEQA challenge. The city made available 20 boxes that contained 2,208 documents totaling more than 58,000 pages. (*Id.* at p. 1017.) When the petitioner noticed that the boxes contained "only a few e-mails," the petitioner submitted to the city a Public Record Act request for " 'all writings evidencing or reflecting communications, stored on [any city] computer hard drive or server' " relating to the subject property. (*Ibid.*) The city reviewed over nine boxes' worth of e-mails and produced the responsive ones to the petitioner. (*Ibid.*) Unsatisfied with the city's response, the petitioner served a demand for inspection listing 15 further demands for documents. (*Id.* at p. 1018.) Before the document requests were resolved and the administrative record certified, the petitioner filed its opening brief on its petition for writ of mandate. (*Ibid.*) The city prevailed on the petition and was awarded over $26,000 for " 'time spent in the email search and production efforts.' " (*Id.* at p. 1013.)

The Court of Appeal affirmed the award, rejecting the notion that the petitioner's election to prepare the record precluded the city "from recovering *any costs whatsoever* in connection with preparation of the record, even when the City is the prevailing party, and even when the City incurred certain extraordinary costs at St. Vincent's behest." (*St. Vincent's School, supra*, 161 Cal.App.4th at p. 1014.) The court found that the "record reflects a total disregard for cost containment on St. Vincent's part, and a complete abandonment of its statutory duty to 'strive to [prepare the record] at reasonable cost.' " (*Id.* at p. 1018, quoting § 21167.6, subd. (f) ["In preparing the record of proceedings, the party preparing the record shall strive to do so at reasonable cost in light of the scope of the record."].) The court found it "telling" that the petitioner did not cite a single

document requested by the petitioner's "additional, broad, unrestricted, and, apparently nonessential, discovery demands." (*Id.* at p. 1019, italics omitted.) Accordingly, the court held "that where necessary to preserve the statutory purposes of cost containment and expediting CEQA litigation, the prevailing party in a CEQA action may recover 'reasonable costs or fees imposed for the preparation' [citation] of the record, even if the nonprevailing party elected to prepare the record pursuant to section 21167.6, subdivision (b)(2). To hold otherwise would only reward litigants who . . . elect to prepare the record but then ignore the concomitant statutory duty to restrain costs in doing so." (*Ibid.*, fn. omitted.)

Applying these principles to the City's subcategories of claimed record-preparation costs, we conclude the trial court erred with respect to all but one subcategory (the third). The first seeks to recover $3,132.66 for 39.8 hours of paralegal time spent "[r]eviewing and correcting the draft record." *Some* of the paralegal's time in this subcategory must have been devoted to reviewing the administrative record for completeness and accuracy—that "chore public agencies face in every case in which the petitioner elects to prepare the record" and for which they are not entitled to recover costs. (*Coalition for Adequate Review, supra*, 229 Cal.App.4th at p. 1059.) However, the paralegal informed the trial court that Advocates's first draft of the administrative record contained "numerous errors and omissions," some of which were "particularly time consuming." On remand, the trial court will need to determine the extent to which (if at all) Advocates's errors and omissions were severe enough that (1) the paralegal's work in addressing them was tantamount to preparing a supplemental record (see *id.* at p. 1057),

29

or (2) they revealed "a total disregard for cost containment on [Advocates's] part" (*St. Vincent's School, supra*, 161 Cal.App.4th at p. 1018). The City may only recover costs that satisfy either of these criteria.

In its second subcategory, the City seeks $1,071.13 for time spent by a paralegal and an associate city planner "[l]ocating Petitioner's 'missing attachments.' " After the City certified the administrative record, Advocates submitted to the City a 26-item "list of documents that are referred to as attachments to items in the record but that are missing from the record." The appellate record does not establish this was anything other than a reasonable request by Advocates that the City perform its expected chore of making all of its project files available so that Advocates could contain costs by preparing the administrative record itself. The City's suggestion that "many" of the attachments were not actually missing and could have been found using Advocates's own index is not well taken. While that may be true for *some* of the attachments (seven out of 26), the City acknowledged it had "not retained" the *vast majority* (16 out of 26) and others either never existed or were not actual attachments. On this record, we conclude it was error to award the City this subcategory of costs.

The City's third subcategory seeks $1,101.94 for 14 hours of paralegal time spent "[o]btaining consultant's documents." After the City stated it had "not retained" many of its consultant's draft reports, Advocates requested that the City obtain them from the consultant. The City replied (and the trial court later ruled) that CEQA did not require that the administrative record include the requested documents because the City had not retained them and its decisionmakers did not rely on them in approving the project.

(§ 21167.6, subd. (e)(10).) Advocates persisted and unsuccessfully sought ex parte relief compelling the City to comply. The City nevertheless collected certain of the requested materials, sent some electronically to Advocates, and made the rest (those that could not be transmitted electronically) available for inspection at the City's offices. Advocates never attempted to review the documents at the City's offices, and the City asserts in its respondent's brief (albeit without citation to the appellate record) that Advocates "never attempted to cite to any of those additional documents in any of its briefs." Although this record is less egregious than that in *St. Vincent's School*, we cannot say the trial court abused its discretion in finding Advocates displayed "a total disregard for cost containment" in connection with this subcategory. (*St. Vincent's School, supra*, 161 Cal.App.4th at p. 1018).

In its final subcategory, the City seeks $495.87 for 6.3 hours of paralegal time spent responding to Advocates's motion to augment the administrative record with certain of the " 'missing attachments.' " The trial court erred by awarding these costs. They do not fall within *Coalition for Adequate Review* because the City opposed—not sought— supplementation of the record. (*Coalition for Adequate Review, supra*, 229 Cal.App.4th at p. 1059.) Moreover, awarding expenses incurred in this motion practice "blur[s]" the line between record preparation and litigation strategy that *Coalition for Adequate Review* warned against. (*Ibid.*) Nor, in light of the fact that the trial court granted (and the City did not oppose) Advocates's motion to augment with respect to eight of the 17 documents, did these costs result from the kind of "total disregard for cost containment" at issue in *St. Vincent's School, supra*, 161 Cal.App.4th at page 1018.

## DISPOSITION

The judgment is reversed with respect to the first, second, and fourth subcategories of the City's costs award. On remand, the superior court is directed to determine how much of the costs in the first subcategory were incurred (1) reviewing the administrative record for completeness or accuracy (for which the City may not recover costs); (2) supplementing the administrative record (for which the City may recover costs); and (3) as a result of a total disregard for cost containment on Advocates's part (for which the City may recover its costs). The judgment is affirmed in all other respects. Real parties in interest are entitled to their costs on appeal; all other parties are to bear their own costs.

HALLER, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

Filed 10/9/15

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NORTH COUNTY ADVOCATES,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF CARLSBAD,<br><br>    Defendant and Respondent,<br><br>PLAZA CAMINO REAL, LP, et al.,<br><br>    Real Parties in Interest. | D066488<br><br><br>(Super. Ct. No. 37-2013-00061990-<br> CU-WM-NC) |

The opinion in this case filed September 10, 2015 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a), for publication is GRANTED, with the exception of Parts III, IV and V.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports, with the exception of Parts III, IV and V.

 

_____

                                HALLER, Acting P. J.

cc: All Parties